UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____        │
│ DATE FILED: 02/28/2017 _____   │
└─────────────────────────────────┘
```

UNITED STATES OF AMERICA

-against-

JEAN VALDEZ,

                Defendant.

**MEMORANDUM
OPINION & ORDER**

16 Cr. 266 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Defendant Jean Valdez is charged with conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.  (Dkt. No. 7)  Valdez was arrested on March 28, 2016, and he has moved to suppress his post-arrest statements and physical evidence recovered from his residence and vehicle that evening.  (Notice of Motion (Dkt. No. 39); Oct. 4, 2016 Tr. (Dkt. No. 51) at 5; Def. Post-Hearing Br. (Dkt. No. 63) at 3[1])  For the reasons stated below, Valdez's motion to suppress will be denied.

**BACKGROUND**

**I.    COMPLAINT ALLEGATIONS**

        In December 2015, the Drug Enforcement Administration ("DEA") began investigating a drug trafficking organization that was transporting narcotics from New Jersey to the Bronx.  (Cmplt. (Dkt. No. 1) ¶ 5)  A confidential source who had proven reliable in the past informed the DEA that a 2015 Kia Sorrento (the "Kia") bearing a certain New Jersey license plate number delivered kilogram quantities of narcotics on a regular basis to a known drug

---

[1]  With the exception of the suppression hearing transcript, the page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Filing system. Citations to the suppression hearing transcript reflect the page numbers assigned by the court reporter.

trafficker operating in the Bronx. (Id. ¶¶ 6-7) The Kia was registered to a relative of Defendant Valdez. (Id. ¶ 10) Motor vehicle records revealed that a 2015 Hyundai Santa Fe (the "Hyundai") was registered to the same relative. (Id. ¶ 11) Toll records for the period between October 2015 and March 2016 showed that the Kia and the Hyundai traveled across the George Washington Bridge from New Jersey to New York "on an almost daily basis and multiple times on certain days." (Id. ¶¶ 12(a)-(b)) The vehicles stayed in New York for short periods of time before returning to New Jersey. (Id.) Both cars were regularly parked at an apartment complex located at 65 River Road in Nutley, New Jersey (the "River Road Apartment"). (Id. ¶ 12(d))

On March 9, 2016, while conducting surveillance outside the River Road Apartment, DEA Special Agent Todd Riley observed Valdez exit the building and dispose of a trash bag. (Id. ¶ 13(a)-(b)) Agent Riley searched the trash bag and recovered, inter alia, "rubber bands, ripped pieces of U.S. currency, at least twenty dryer sheets, . . . and handwritten ledgers." (Id. ¶ 13(f)) "[T]he [l]edgers . . . appeared to reflect drug-related transactions." (Id.) Riley was also aware that "dryer sheets are typically used . . . to mask the smell of drugs," and he believed that "the rubber bands . . . were likely used to hold together stacks of U.S. currency." (Id.)

On March 28, 2016, at about 1:00 p.m., Agent Riley observed Valdez leave the River Road Apartment carrying a backpack, enter the Kia, and drive to a warehouse parking lot in Elmwood Park, New Jersey, where he met co-defendant Jose Manuel Montes de Oca at about 1:30 p.m. (Id. ¶¶ 14(a)-(b)) Montes de Oca removed a rectangular box from the Kia and placed it in a nearby Honda Accord. (Id.) Montes de Oca left the warehouse parking lot in the Honda Accord at about 3:40 p.m. (Id. ¶ 14 (e)) Elmwood Park police officers working with the DEA stopped Montes de Oca's vehicle about fifteen minutes later. (Id. ¶ 14(f)) Montes de Oca consented to a search of his vehicle, and Agent Riley recovered one kilogram of cocaine from

2

the box that Montes de Oca had been observed transferring from Valdez's car to his own.  (Id. ¶¶ 14(g)-(n))  Montes de Oca was placed under arrest.

At about 8:00 p.m., law enforcement officers stopped Valdez in the Kia in Clifton, New Jersey.  (Id. ¶ 15(a))  Valdez "provided oral and written consent" to search the Kia.  (Id. ¶ 15(b))  Agents recovered the backpack and discovered a large hidden compartment – or "trap" – in the rear area of the vehicle.  (Id.)  A canine unit arrived at the scene, and the dog reacted to the backpack and to the area in and around the trap.   (Id. ¶ 15(c))  Valdez was then placed under arrest.  (Id.)

At about 9:15 p.m., Agent Riley interviewed Valdez at the Passaic County Sheriff's Office (the "Sheriff's Office").  (Id. ¶ 16)  Riley gave Miranda warnings to Valdez, and Valdez waived his rights.  (Id.)  During the interview, Valdez provided written consent to search the River Road Apartment and the Hyundai parked at that location.  (Id. ¶ 16(a))  Agents had recovered keys from the Kia, and Valdez showed agents which keys opened the River Road Apartment and the Hyundai.  (Id. ¶ 16(c))  He also told agents how to open a trap in the Hyundai, and provided the access code necessary to gain entry to the apartment complex.  (Id. ¶¶ 16(e))  Inside the River Road Apartment, Agent Riley found approximately $100,000 in cash, a money counter, a heat sealer, several empty heat seal bags, and a ledger.  (Id. ¶¶ 16(d), 17)  Agents found six kilograms of cocaine in the trap inside the Hyundai.  (Id. ¶¶ 16(e), 18)

After searching the River Road Apartment and the Hyundai, Agent Riley conducted a second interview of Valdez at the DEA's Manhattan headquarters.  This interview was videotaped.  (Id. ¶ 19)  Riley again administered Miranda warnings, and Valdez again waived his rights.  (Id.)  Valdez admitted that he had met with Montes de Oca earlier that day

3

and provided him with a kilogram of cocaine.  (Id. ¶ 19(a))  Valdez also stated that he had

received ten kilograms of cocaine in 2016 and had sold three kilograms of cocaine.  (Id. ¶ 19(b))

## II.   VALDEZ'S AFFIRMATION

In an October 7, 2016 affirmation, Valdez states the following:  On March 28,

2016, at approximately 6:30 p.m., he was driving his brother's Kia in Clifton, New Jersey, when

a Passaic County Sheriff's officer stopped the vehicle.  (Supp. Valdez Aff. (Dkt. No. 47) ¶¶ 6-7)

Also inside the Kia were Valdez's brother, Joan Valdez, and Nelson Rodriguez, a friend.  (Id. ¶

7)  The officer claimed to be looking for three armed robbery suspects.  (Id. ¶ 9)  Prior to the

stop, Valdez had committed no traffic infraction.  (Id. ¶ 19)  Moreover, none of the occupants of

the Kia were armed and none had committed a robbery.  (Id.)  The officer nonetheless directed

Valdez to drive to a nearby cul-de-sac off Route 21.  (Id. ¶¶ 10-11)  When Valdez arrived at this

location, the Kia was surrounded by law enforcement officers.  (Id. ¶ 12)  One officer led a drug

dog around the car, but the dog "remained calm."  (Id. ¶¶ 12-15)  Valdez was placed under

arrest.  (Id. ¶ 21)

Valdez was then transported to the Passaic County Sheriff's Office in Wayne,

New Jersey.  In route to the Sheriff's Office, officers "immediately began asking [Valdez]

questions," even though he "was '**dazed**' from the arrest."  (Id. ¶ 22) (emphasis in original)

When he arrived at the Sheriff's Office, Valdez faced "simultaneous[]" and "rapid" questioning

from a numerous officers.  (See id. ¶¶ 24-25)  Valdez "was never advised of [his] rights" and

"**never** waived [his] rights."  (Id. ¶ 23) (emphasis in original)  He also "**never gave oral or**

**written** consent" for the search of his residence or any vehicle.  (Id. ¶¶ 25-26, 28) (emphasis in

original)

4

Valdez was later transported to the DEA's Manhattan offices, where agents interrogated him again. (Id. ¶¶ 32, 36)  By that time, Valdez was "hungry," "sleepy," "nervous," "paranoid," and "traumatized."  He "had a headache," and his "mind was somewhere else."  (Id. ¶ 33(b))  He was "**petrified** and cold, and [his] right leg was itching as if [he] had poison ivy." (Id. ¶ 35) (emphasis in original)  "[T]he officers "**never** told [Valdez] that [he] could remain silent."  (Id. ¶ 38) (emphasis in original)  During this second interview, Valdez "did not wa[i]ve [his] constitutional right[] to remain silent" and "**did not give oral consent or written consent**" to "a search of [his] vehicle, property or apartment."  (Id. ¶ 41) (emphasis in original)

## III.   EVIDENCE AT SUPPRESSION HEARING

The Court conducted a three-day evidentiary hearing concerning Valdez's suppression motion between October 17, 2016 and November 2, 2016.  Agent Riley, Detectives Michael Patti and Sebastian Biondo of the Passaic County Sheriff's Office, and New York City Police Department ("NYPD") Detective Joseph King testified on behalf of the Government. Valdez testified in his own behalf.

### A.   The Government's Evidence

#### 1.   Investigation

In the months preceding March 2016, DEA agents began investigating Valdez after "receiv[ing] information that he was selling quantities of cocaine and heroin."  (Suppression Hearing Transcript (Dkt. Nos. 73, 75, 77) ("Hearing Tr.") at 42, 476)  DEA Task Force T32 – of which Agent Riley and Detective King are a part – conducted the investigation.  (Id. at 32-33, 114-15, 438-39)  The Task Force learned that Valdez was "coming back and forth from New Jersey to New York" and "identified . . . two cars" that he used to make these trips.  (Id. at 476-77, 535-36)  While surveilling Valdez, Task Force members "observed him in the Bronx on

numerous occasions sitting with individuals[ who were] potential buyers." (Id.) Valdez was also observed on numerous occasions at the River Road Apartment in Nutley, New Jersey. (See id. at 476)

On the morning of March 28, 2016, Agent Riley was conducting surveillance outside the River Road Apartment. (Id. at 83-84) He observed Valdez "exit the apartment building carrying a book bag and get into [a] Kia Sorento." (Id. at 84) Riley surveilled Valdez to a parking lot outside of Montes de Oca's workplace. (Id. at 84, 477) In the early afternoon, he observed a brief meeting between Valdez and Montes de Oca inside the Kia. (Id. at 84-85, 477) After the meeting, Montes de Oca got out of the vehicle carrying a box. (Id. at 477) Montes de Oca drove away, followed by Agent Riley and Detective King. They stopped Montes de Oca's vehicle and recovered one kilogram of cocaine from the vehicle. (Id. at 86, 443, 477, 479, 530) Montes de Oca was then placed under arrest. (Id.) Believing that Valdez had provided the cocaine found in Montes de Oca's vehicle, Riley contacted the DEA's New Jersey office and requested assistance in stopping Valdez's Kia. (Id. at 87, 92, 443) He also spoke with Michael Patti – a Passaic County Sheriff's Office detective and a DEA Task Force officer – about stopping and searching Valdez's Kia. (Id. at 82, 86, 92, 302-06, 326, 333)

### 2.      Traffic Stop in Clifton, New Jersey

Detective Patti stopped Valdez's Kia on Route 21 in Clifton, New Jersey, at about 8:00 p.m. (Id. at 82, 307-08) Patti was in a marked patrol car. (Id. at 306-08) Patti approached the Kia and observed Valdez in the driver's seat along with two passengers. (Id. at 308-09) After Patti asked Valdez for his license and registration, another officer directed Valdez to drive to a nearby parking lot off the highway. (Id. at 310-11)

After arriving at the parking lot, Valdez and the other occupants of the Kia were directed to exit the vehicle. (Id.) Agent Riley and Detective King arrived shortly thereafter and found Valdez and the other occupants standing at the rear of the Kia. (Id. at 445-46) King asked Valdez whether the Kia was his vehicle, and whether he would "mind if [the agents] take a look in th[e] car." (Id. at 447) Valdez told King that the Kia was his vehicle, and he consented to a search. (Id.)

Detective King and Agent Riley asked Detective Patti for a consent to search form. (Id. at 311) Patti then asked Valdez whether he consented to a search of the Kia. After Valdez said "Yes," Patti retrieved a Passaic County Sheriff's Office consent to search form from his vehicle. (Id. at 311, 314-15, 346-47, 360-61) On the second line of the consent form, Patti wrote "Det. Patti/DEA NY" as the individuals "voluntarily authorize[d]" to conduct the search, and at the bottom of the form, Patti printed his name and the date. (Id. at 311-12, 354-55; GX 3) Patti then handed the form to King and Riley. (Hearing Tr. 311-12, 354) Riley then added, inter alia, information concerning the Kia and its location (Riley's additions are underlined):

> The undersigned, residing at 301 Riverfront Blvd, Elmwood Park, NJ does hereby voluntarily authorize Det. Patti/DEA NY and other officers he may designate to assist him, to search my residence/business (or other property) located at _____ and/or my motor vehicle, namely my 2015 Kia Sorento bearing license plate number N94FSN of the state of New Jersey, presently parked or located at 39-49 Ackerman Ave, Passaic. And I further authorize said officers to remove from my residence/motor vehicle, whatever documents, or items of property whatsoever which they deem pertinent to their investigation, with the understanding that said officers will provide me with a receipt for any item(s) removed.
>
> I am giving this written permission to these officers freely and voluntarily, without any threats or promises having been made, and having been informed of my constitutional right not to have a search made of my person or premises and motor vehicle described herein without a search warrant and of my right to refuse consent to a search and/or seizure.

(Id. at 50-55; see also GX 3)  Riley handed the form to King, who reviewed it with Valdez.  (Id. at 53, 313, 450-51)  Valdez then signed the form. (Hearing Tr. at 317-20, 451-54)  King and Patti both observed Valdez sign the form, and King signed the form as witness.  (Id.)  At that time, the form only addressed consent to search the Kia; neither King nor Riley had spoken with Valdez about the River Road Apartment or the Hyundai. (Id. at 455, 464-65)

After obtaining Valdez's consent to search the Kia, Agent Riley and Detective King searched the vehicle.  (Id. at 456)  At King's request, Detective Patti arranged for a canine unit to report to the scene.  (Id. at 320, 456-57)  Detective Sebastian Biondo of the Passaic County Sheriff's Office arrived with his trained narcotics search dog.  (Id. at 395-97, 402-03)  The dog did not alert to the exterior of the vehicle, but "scratch[ed] . . . and bit[] at" the black book bag that Agent Riley had observed Valdez carrying out of the River Road Apartment building earlier that day.  (Id. at 404-05, 458-60)  The dog also alerted to the Kia's rear cargo area, which contained a "concealed compartment."  (Id. at 405, 460-61)  Detective Biondo testified that the dog's behavior indicated the presence of controlled substances.  (Id. at 405)  Both the book bag and hidden compartment were empty, however.  (Id. at 555-56)

After the search of the Kia, Valdez was placed under arrest and transported to the Passaic County Sheriff's Office.  (Id. at 322, 462)  Valdez was brought to the Sheriff's Office because it was "in the vicinity of where the car stop happened," and because the agents "were anticipating applying for a search warrant for [the River Road Apartment]."  (Id. at 466)

### 3.   Interview at the Passaic County Sheriff's Office

Valdez arrived at the Passaic County Sheriff's Office at about 9:00 p.m. (See GX 25 at 9-10)  Agent Riley and Detective King arrived shortly thereafter and brought Valdez into

8

an interview room. Riley took the lead in conducting the interview, which lasted twenty to thirty minutes. (Hearing Tr. at 98, 476)  This interview was not recorded. (Id. at 40, 95)

### a.    Miranda Warnings

At the outset of the interview, Agent Riley orally administered Miranda warnings. He informed Valdez that "he had the right to remain silent; anything that he said could and would be held against him in a court of law.  He had a right to an attorney.  If he could not afford one, one would be appointed to him at no cost, and he could stop the questioning at any time." (Id. at 38, 465, 470)  Riley asked Valdez if he "understood those rights," and Valdez answered "Yes." (Id. at 38-39, 470)  According to King, Valdez said "that he wished to answer some questions." (Id. at 470)  Riley and King did not provide Valdez with a written Miranda waiver form, although that is their usual practice when conducting interviews at the DEA's headquarters in Manhattan. (Id. at 472-73)

During this interview, Valdez never sought to stop the questioning, and he did not ask to speak with an attorney. (Id. at 62, 489-90, 520-21)  Valdez was cooperative and at all times appeared to understand what was happening. (Id.)

### b.    Substance of the Interview

Agent Riley began the interview by "la[ying] out some of the information [the agents] . . . knew about [Valdez's criminal activities]. . . ." (Id. at 476)  Agent Riley told Valdez that he had received information that Valdez was selling cocaine and heroin; that he knew Valdez "was coming back and forth from New Jersey to New York"; and that he had observed Valdez in the Bronx on numerous occasions with suspected buyers. (Id. at 476-77)  Riley also informed Valdez that he had been under surveillance and that the DEA knew about his residence at 65 River Road and the two cars – the Kia and the Hyundai – that he had used to travel between

9

New Jersey and New York.  (Id. at 42, 476, 535-36)  Riley also told Valdez that he had observed

Valdez's meeting with Montes de Oca earlier that day, and that the DEA had already arrested

Montes de Oca and recovered one kilogram of cocaine from his vehicle.  (Id. at 477)

After learning that the DEA had recovered the cocaine from Montes de Oca,

Valdez "admitted to everything."  (Id. at 479)  Valdez admitted that "he had been involved in a

drug transaction [with Montes de Oca] that [Agent Riley] earlier observed," and that "[h]e

provided [Montes de Oca with] one kilo of cocaine."  (Id. at 40, 473)  Although Valdez spoke

about his own drug trafficking, he told Riley and Detective King that "he was not comfortable at

[the] time talking about other people inside of his organization because they were either family

or close family friends."  (Id. at 43, 126)

When asked about the River Road Apartment, Valdez said that he had lived there

by himself and that there was "a large amount of U.S. currency along with some paraphernalia"

inside the apartment.  (Id. at 40-41, 473)  Valdez said that the currency – "a hundred thousand

dollars in cash" – was contained in "a trash bag behind a closet door."  (Id. at 41)  Valdez gave

Riley and King the access code for the River Road Apartment building, and he also identified the

key for the River Road Apartment, which was on a key ring recovered from the Kia.  (Id. at 48,

475, 502, 555, 563)

As to the Hyundai parked outside the River Road Apartment, Valdez confirmed

that he operated the vehicle and that it "had a hidden compartment in the rear . . . trunk area."

(Id. at 40-42)  Valdez told Riley and King that the compartment "contained seven kilos of

cocaine."  (Id. at 42)  Valdez also instructed Riley and King how to open the secret compartment,

which involved pressing various buttons in the front passenger compartment in a certain

sequence.  (Id. at 40-42, 47, 474-75)  Valdez also identified the key for the Hyundai, which had

been recovered from the Kia earlier that day.  (Id. at 48, 475, 555, 563)

### c.  **Consent to Search**

Agent Riley and Detective King testified that Valdez provided both oral and

written consent to search the River Road Apartment and the Hyundai.  As to oral consent, during

the interview, Riley asked Valdez whether "he would mind if [the DEA] searched both the

apartment and the [Hyundai] Santa Fe."  (Id. at 43-44, 480-81)  Valdez agreed to the search of

both the apartment and the Hyundai.  (Id. at 43, 480-81)

At the end of the interview, Agent Riley prepared a handwritten consent form to

"memorialize" Valdez's oral consent to the search of the River Road Apartment and the

Hyundai.  (Id. 43-46, 95, 480-85; see also GX 7)  The handwritten consent form prepared by

Agent Riley reads as follows:

> I _____, do hereby give consent to New York Drug Enforcement Task
> Force, G[r]oup T-32, to search 65 River Rd, Apt 214, Nutley, NJ [and] 2015
> Hyundai Santa Fe [at] same.

(Hearing Tr. at 45, 480; see also GX 7)  Riley reviewed the form with Valdez and asked him to

sign it.  (Hearing Tr. at 46, 484-85)  In the presence of both Riley and King, Valdez signed and

printed his name in the blank space, and dated the form.  (Id. at 46, 483-85)  Valdez also wrote in

the number "1780," which is the PIN code for accessing the River Road Apartment building.

(Id.)  Riley and King signed the form as witnesses.  (Id. at 46-47, 484)

After Valdez signed the handwritten consent form, Agent Riley presented Valdez

with the Passaic County Sheriff's Office consent to search form, which Valdez had signed at the

scene of the traffic stop.  (Id. at 56-57, 486; see also GX 3)  In order to "memorialize the consent

that [he had] just received [onto a] more formal piece of paper," Riley told Valdez that he was

going to amend the Sheriff's Office consent to search form to include the River Road Apartment.

(Hearing Tr. at 56-57, 127, 130, 486-87)  As amended, the form read as follows (Riley's

alterations are underlined):

> The undersigned, residing at 301 Riverfront Blvd, Elmwood Park, NJ / 65 River
> Rd, 214, Nutley, NJ does hereby voluntarily authorize Det. Patti/DEA NY and
> other officers he may designate to assist him, to search my residence/business (or
> other property) located at 65 River Rd, 214, Nutley, NJ and/or my motor vehicle,
> namely my 2015 Kia Sorento bearing license plate number N94FSN of the state
> of New Jersey, presently parked or located at 39-49 Ackerman Ave, Passaic.  And
> I further authorize said officers to remove from my residence/motor vehicle,
> whatever documents, or items of property whatsoever which they deem pertinent
> to their investigation, with the understanding that said officers will provide me
> with a receipt for any item(s) removed.
>
> I am giving this written permission to these officers freely and voluntarily,
> without any threats or promises having been made, and having been informed of
> my constitutional right not to have a search made of my person or premises and
> motor vehicle described herein without a search warrant and of my right to refuse
> consent to a search and/or seizure.

(Hearing Tr. at 50-53, 487; see also GX 3)  Riley added the address of the River Road Apartment

"right in front of" Valdez and explained the changes he was making to "the original consent

form." (Hearing Tr. at 57-58, 487-88)  Valdez did not object to the changes.  (Id. at 489)  Valdez

was not asked to initial the changes, however, and Riley did not note the time of the amendment

or have Detective King initial the changes as a witness.  (Id. at 58, 128-29, 131, 136, 488-89)

   As Valdez was giving consent to search the River Road Apartment and the

Hyundai, Detective King sent text message updates to all other members of the T32 Task Force.

(Id. at 91, 490-91)  On March 28, 2016 – the day of Valdez's arrest – task force members texted

each other "contemporaneously with what was happening."  (Id. at 155)  After Valdez's arrest,

the following text messages were sent to T32 Task Force members:

> 3/28/16, 8:51 PM -- [Riley]:  Joe and I are taking [Valdez] . . . to passaic HQ.
>
> . . .

3/28/16, 9:20 PM  --  [King]:  verbal

. . .

3/28/16, 9:21 PM  --  [King]:  . . . im just documenting verbal consent

. . .

3/28/16, 9:34 PM  --  [Riley]:  We got consent, key, and pin to enter

. . .

3/28/16, 9:39 PM  --  Brian Meyer:  Todd are we gonna do consent on river road

3/28/16, 9:41 PM  --  [Riley]:  Yes

3/28/16, 9:42 PM  --  [Riley]:  And consent with Santa Fe.  Says its trapped out

(GX 25 at 9-11)

After Valdez was interviewed at the Passaic County Sheriff's Office, he was brought to the DEA's Manhattan office.  (Hearing Tr. at 59, 139, 504)  Meanwhile, Agent Riley and Detective King drove to the River Road Apartment, where they searched the apartment and the Hyundai parked outside.  (Id. at 59, 504)

### 4.    Search of the River Road Apartment and the Hyundai

Agent Riley and Detective King arrived at the River Road Apartment at about 10:30 p.m.  (Id. at 140)  The agents entered the apartment "us[ing] the pin pad access code . . . and the key provided by . . . Valdez."  (Id. at 63, 504)  Inside the apartment, they "found the trash bag behind the closet door, which contained approximately . . . a hundred thousand dollars."  (Id. at 63, 504-05)  The trash bag also contained "drug paraphernalia," including a money counter, a heat sealing machine, plastic bags for heat sealing, rubber bands, and drug ledgers.  (Id. at 63, 66-67, 505)

The agents then searched the Hyundai parked outside.  (Id. at 67, 506)  Agent Riley accessed the vehicle using the key identified by Valdez.  (Id. at 68)  The agents followed the instructions provided by Valdez for opening the trap, but were not successful in gaining access to it.  Accordingly, they used an electronic charge to bypass the trap's locking mechanism and open the compartment.  (Id. at 69, 506-07)  Inside the trap, agents found six kilograms of cocaine.  (Id.)  Between 11:00 p.m. and midnight, Riley and Detective King completed their searches and returned to the DEA's Manhattan office.  (Id. at 140, 507)

### 5.    Interview at the DEA's Office in Manhattan

After their arrival at the DEA's Manhattan headquarters, Agent Riley and Detective King conducted a second interview of Valdez.  This interview was videotaped.  (Id. at 71; see also GX 14)

At the outset of the interview, Agent Riley introduces himself "again" and says, "just like we did before, I'm just going to read you your rights again, alright?"  (GX 14 at 0:54-1:07)  Riley and King testified that this reference "memorialize[d] [their] prior conversation [with Valdez] at the Passaic County Sheriff's Office," and "reminded . . . Valdez that [Riley] discussed his Miranda warnings with him before and [Riley] was going to go over it with him again."  (Hearing Tr. at 74-75, 153, 509-10)  The video then shows Riley administering Miranda warnings to Valdez, after which Riley asks Valdez, "Do you understand your rights?"  (GX 14 at 1:07-1:26)  Valdez nods his head and replies, "Yes."  (Id.)

After administering Miranda warnings to Valdez, Agent Riley asks Valdez to "walk [him] through" the day's events.  (Id. at 2:10-2:35)  Valdez then discusses his meeting with Montes de Oca, whom he refers to as "Jose."  Valdez states that Montes de Oca "called [him]" that morning and that he drove to meet with Montes de Oca "by [his] work."  (Id. at 3:00-

3:55)  When he arrived, Montes de Oca entered Valdez's car with a box.  Valdez then gave him

"the drugs."  (Id. at 3:55-4:32)  Agent Riley asks, "what was it, coke?  Heroin?"  Valdez

answers, "coke."  (Id. at 4:25-4:45)  Valdez further states that Montes de Oca placed the cocaine

in the box and got out of Valdez's car with the box.  (Id. at 4:40-4:52)  Valdez then drove away.

(Id. at 5:20-5:30)  The video also shows Valdez telling Riley and King that Montes de Oca owed

him "thirty-three" for the cocaine.  (Id. at 4:50-5:03)  Valdez also tells the agents that he had

received ten kilograms of narcotics over the past year, had distributed three, and had seven

kilograms remaining.  (Id. at 10:45-11:40)

       The videotape also shows Agent Riley reviewing other information Valdez

provided at the Passaic County Sheriff's Office, including (1) Valdez's statements about the

River Road Apartment and the access code for the building; (2) Valdez's statements about the

Hyundai, including the hidden compartment and how to open it; and (3) how Valdez "gave [the

agents] consent and everything to get into the apartment and . . . car."  (Id. at 6:10-8:57, 15:15-

15:30, 17:00-18:05; Hearing Tr. at 77-79, 153, 514-15):

> So we talked to you and then you obviously knew that we knew a lot more about
> you.  And then you told us about your apartment on River Road, and you gave us
> the code to get in there.  And you told us about the [Hyundai] Santa Fe, right?
> And, how to get into the – we couldn't figure it out, how do you open the trap
> again?"

(GX 14 at 6:10-7:02)

       Valdez nods his head and says "mmhmm" as Riley references the earlier

interview.  (See id. at 6:10-8:57)  When the trap in the Hyundai is mentioned, Valdez explains

again the sequence in which buttons in the front passenger area must be pressed to open the trap.

(Id. at 6:40-7:03)  And when Riley asks – "inside there . . . is it coke and heroin?" – Valdez

answers that the trap contains "coke only."  (Id. at 7:03-7:15)

Riley next tells Valdez that the bag of money he had told agents about was recovered in the River Road Apartment: "and then just like – just like you told us, there was that big bag of money in [the apartment], and how much is that about?" Valdez replied, "one hundred something." (Id. at 7:55-8:06) In seeking to persuade Valdez to identify his supplier, Riley references the significant cooperation Valdez has already provided: "[y]ou've been really honest so far. . . . [Y]ou gave us the consent and everything to get into the apartment and your car, and you gave us the keys." (Id. at 8:35-9:00)

As Riley recites what Valdez told him and Detective King at the Sheriff's Office, Valdez never denies or disputes any aspect of Riley's summary. (Hearing Tr. at 78-79, 515; see GX 14) Indeed, he appears to acknowledge the accuracy of Riley's account, and explicitly confirms several aspects of it.

Valdez likewise does not object at any point to the questioning, and he does not request an attorney. (Hearing Tr. at 79-80, 520-21) Indeed, both Riley and King testified that Valdez was "calm" and "cooperative" throughout the interview and appeared to understand what was happening. (Id. at 78, 80, 520-21) The videotape (GX 14) corroborates their testimony.

**B.    Valdez's Testimony**

Valdez testified that, on March 28, 2016, he was driving with his brother and cousin on Route 21 in Clifton, New Jersey, when a Passaic County Sheriff's officer stopped his Kia Sorento. (Hearing Tr. at 163-65) The officer stated that he was "looking for three people who had committed [an armed] robbery," asked for identification, and then requested that Valdez drive to a safer location just off the highway. (Id. at 165) At a nearby parking lot, the officer "asked [Valdez and the other occupants] to get out of the car." (Id.) The officer said that "he was going to check for weapons," and he then began to search the vehicle with "[s]everal" other

16

officers. (Id. at 165-66) Valdez testified that the officers "never asked [him for] permission" to search the vehicle. (Id. at 166-67, 288) Valdez further testified that he was not shown, and did not sign, a consent form. (Id. at 162-63, 167, 288-89) When shown the Passaic County Sheriff's Office consent to search form at the suppression hearing, Valdez testified that he had never seen the form before and that the signature on the form was not his. (Id. at 163, 175-76, 288-89, 293)

After the search of the Kia, the officers who were searching Valdez's vehicle "told [a female] sheriff [officer] to arrest [him] and to . . . [place him in] handcuffs." (Id. at 169-70) Valdez was then brought to the Passaic County Sheriff's Office. (Id.) Agent Riley and "another officer" brought him into an interview room, and Riley began to speak with him. (Id. at 171-72) Valdez testified that Riley did not advise him of his right to remain silent, his right to an attorney, or his right to stop speaking with the agents. (Id. at 172-73, 189-90, 252-53) Valdez testified that he initially lied to Riley about his residence and the location of the Hyundai. Once Valdez realized that Riley knew that he lived at 65 River Road, however, Valdez admitted that he lived at that location and that the Hyundai was parked outside. (Id. at 190, 193-94, 248-49) Valdez also provided the PIN code to enter the apartment building. (Id. at 194) When shown keys, however, Valdez merely confirmed that the keys belonged to him. (Id. at 194-95, 244-50)

Valdez denies that he told Agent Riley, during this interview, that (1) a bag of money was stored at the River Road Apartment; (2) the Hyundai had a secret hidden compartment; or (3) the secret compartment inside the Hyundai contained cocaine. (Id. at 250-51, 259) Valdez also testified that he never consented to a search of the River Road Apartment or the Hyundai parked outside. (Id. at 175-77) When questioned at the suppression hearing about the handwritten consent form (see GX 7) and the Passaic County Sheriff's Office consent to search form (see GX 3), Valdez testified that he had never seen these forms before and that his

17

signature does not appear on either form.[2]  (Hearing Tr. at 162-63, 175-79, 195-96, 254-58)

Valdez further testified that while he had provided Riley with the PIN code to access his

apartment building, Riley "never said [agents] were going inside the apartment." (Id. at 243)

Moreover, when Agent Riley inquired about the location of the Hyundai and whether the agents

could "check" to see if it was parked outside the River Road Apartment, Valdez told him, "[y]ou

need a warrant." (Id. at 191-92)

      After his interview at the Sheriff's Office, Valdez was transported to the DEA's

Manhattan headquarters and placed in a holding cell. (Id. at 197-99)  Agent Riley and the "other

officer" arrived later that night and, after speaking briefly with Montes de Oca – who had been

put in a "separate cell[]" – brought Valdez into a room for a second interview.  (Id. at 198-99)

Valdez testified that, at this point, he was "worried" and "in shock over what had happened. . . .

[and] so [he] wasn't . . . thinking straight." (Id. at 201-02)  Valdez acknowledged that the

videotape of the interview shows Agent Riley administering Miranda warnings to him. (Id. at

202-03)  He also conceded that he "understood all the rights that Agent Riley told [him] at the

beginning" of the interview.  (Id. at 239)  Valdez maintained, however, that his "mind was

somewhere else" and he "wasn't OK at that moment."  (Id. at 202-03)  According to Valdez,

after Agent Riley gave him Miranda warnings, he thought Riley "was going to say, 'Are you

going to remain silent or are you going to call a lawyer?'"  (Id. at 238)  Instead, Riley "just

---

[2]  At the suppression hearing, Valdez challenged the authenticity of his signature on two other
forms.  With respect to a Prisoner Medical Records Release Form (GX 15), Valdez testified that
he did not recognize the signature on the form as his own, and stated that he "sign[s] differently."
(Hearing Tr. at 278-79)  With respect to a U.S. Marshal Service Federal Prisoner's Property
Receipt (GX 16), Valdez testified that the signature on the form "seems a little like" his signature
but that he "do[es]n't remember having signed th[e] paper."  (Hearing Tr. at 279-80)

started talking to [Valdez] as if he were [Valdez's] friend," and Valdez answered because he "wasn't thinking straight." (Id. at 223)

As to the substance of the second interview, Valdez acknowledged that he told Agent Riley that he met Montes de Oca earlier in the day, that he provided him with one kilogram of cocaine, and that Montes de Oca owed him $33,000 for the cocaine. (Id. at 224-26) Valdez also acknowledged that – during the second interview – Agent Riley referenced Valdez's prior consent to search the River Road Apartment and the Hyundai, and that Valdez did not object to Riley's summary of what had happened during the earlier interview at the Sheriff's Office. (See id. at 229-30, 233-34) Valdez testified that although he "knew what [Riley] was saying," and answered Riley's questions, he "really d[id]n't know what was going on." (Id. at 234) According to Valdez, "[i]t's not shown [on the videotape] but . . . personally, [he] wasn't there those 30 minutes." (Id. at 267)

## DISCUSSION

## I.    MOTION TO SUPPRESS

On August 19, 2016, Valdez moved to

(1) [s]uppress[] physical evidence seized from a vehicle that . . . Valdez was not driving at the time of his arrest and from which agents allegedly recovered narcotics; [and]

(2) [s]uppress[] any post-arrest statements made by . . . Valdez on the grounds that they were secured as a result of an unlawful search and unlawful arrest[,] and that [the] statements were taken . . . without reading his Miranda right[s].

(Notice of Motion (Dkt. No. 39) at 1) (emphasis in original)

At an October 4, 2016 conference, Valdez stated that he was also moving to suppress physical evidence recovered from the River Road Apartment.[3] (See Oct. 4, 2016 Tr. (Dkt. No. 51) at 5)

Accordingly, the Court understands Valdez to seek suppression of: (1) any post-arrest statements arising out of the interviews conducted at the Passaic County Sheriff's Office and the DEA's Manhattan office; and (2) any physical evidence seized from the River Road Apartment and the Hyundai parked outside that location. (See Def. Post-Hearing Br. (Dkt. No. 63) at 3)

In support of his suppression motion, Valdez contends that (1) the Task Force lacked probable cause to arrest him on March 28, 2016 (Def. Post-Hearing Br. (Dkt. No. 63) at 16-19); (2) he never gave oral or written consent to search the River Road Apartment or the Hyundai (id. at 24-25); and (3) his post-arrest statements should be suppressed because they were "taken . . . without reading [him] his Miranda rights[s]" and were "coerced by law enforcement agents." (Notice of Motion (Dkt. No. 39) at 1; Def. Moving Br. (Dkt. No. 29-1) at 2, 5-8)

The Government argues that (1) agents had probable cause to arrest Valdez on March 28, 2016 (Gov't Post-Hearing Br. (Dkt. No. 67) at 23); (2) Agent Riley administered Miranda warnings to Valdez before both interviews, and Valdez waived his rights before both interviews (id. at 26-27); and (3) Valdez consented to the search of both the River Road Apartment and the Hyundai. (Id. at 24-25)

_____

[3] Valdez has never moved to challenge the search of the Kia – the car he was driving at the time of his arrest. (See Notice of Motion (Dkt. No. 39); Oct. 4, 2016 Conf. Tr. (Dkt. No. 51) at 4-5, 10; Hearing Tr. at 28-31) Therefore, the validity of that search is not addressed here.

A.     **Probable Cause to Arrest**

1.     **Applicable Law**

The Fourth Amendment protects "[t]he right of the people to be secure in their

persons . . . against unreasonable searches and seizures." U.S. Const., amend. IV.  "A

warrantless arrest is unreasonable under the Fourth Amendment unless the arresting officer has

probable cause to believe a crime has been or is being committed."  United States v. Delossantos,

536 F.3d 155, 158 (2d Cir. 2008) (citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004); United

States v. Watson, 423 U.S. 411, 417 (1976)).  "'Probable cause to arrest a person exists if the law

enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge

or reasonably trustworthy information to justify a person of reasonable caution in believing that

an offense has been or is being committed by the person to be arrested.'"  United States v.

Valentine, 539 F.3d 88, 93 (2d Cir. 2008) (quoting United States v. Patrick, 899 F.2d 169, 171

(2d Cir. 1990)).  "The quantum of evidence required to establish probable cause to arrest need

not reach the level of evidence necessary to support a conviction, but it must constitute more

than rumor, suspicion, or even a 'strong reason to suspect.'"  United States v. Fisher, 702 F.2d

372, 375 (2d Cir. 1983) (quoting Henry v. United States, 361 U.S. 98, 101 (1959)) (internal

citations omitted).  "When making a probable cause determination, '[t]he experience of a [law

enforcement] officer is a factor to be considered.'"  Arias v. United States, Nos. 09 Civ. 4536

(CM), 07 Cr. 813 (CM), 2011 WL 1332190, at *3 (S.D.N.Y. Mar. 31, 2011) (quoting Fisher, 702

F.2d at 378) (alterations in original).

"The temporary detention of an individual during a traffic stop is [also] subject to

limitation under the Fourth Amendment as a 'seizure' of the person."  Holeman v. City of New

London, 425 F.3d 184, 189 (2d Cir. 2005) (citing Whren v. United States, 517 U.S. 806, 809-10

(1996)). "Accordingly, such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." United States v. Scopo, 19 F.3d 777, 781 (2d Cir. 1994)) (internal citations and quotation marks omitted).

### 2.    Analysis

Valdez argues that "[n]o probable cause existed on March 28, 2016 for his arrest," and that, accordingly, the evidence obtained from the subsequent interrogations and searches must be suppressed. (Def. Post-Hearing Br. (Dkt. No. 63) at 3, 16)  The Court concludes, however, that Valdez's arrest was supported by ample probable cause.

At the time of Valdez's arrest on March 28, 2016, Agent Riley was aware of the following information concerning Valdez:

(1) a confidential source – who had provided reliable information to the DEA in the past – reported that a Kia bearing a certain New Jersey license plate was regularly being used to deliver narcotics to a known drug trafficker operating in the Bronx (Cmplt. (Dkt. No. 1) ¶¶ 6-7);

(2) motor vehicle records showed that the Kia and the Hyundai were both registered to Valdez's brother, Joan Valdez (id. ¶¶ 10-11; Hearing Tr. at 131, 534);

(3) traffic toll records showed that the Kia and the Hyundai were driven back and forth between New Jersey and New York "on an almost daily basis," and that the vehicles remained in New York "for short periods of time before returning to New Jersey" (Cmplt. (Dkt. No. 1) ¶¶ 12(a)-(b));

(4) Agent Riley and other agents observed the driver of the Kia meet with "potential buyers" in the Bronx on numerous occasions (Hearing Tr. at 476-77; see also Cmplt. (Dkt. No. 1) ¶ 8);

(5) the Kia and the Hyundai were "regularly parked" outside the River Road Apartment (Cmplt. (Dkt. No. 1) ¶ 12(d));

(6) Agent Riley had observed Valdez place a trash bag in a dumpster outside the River Road Apartment and, when Riley recovered the trash bag, he found that it contained what appeared to be handwritten ledgers reflecting drug transactions, and a number of items associated with drug trafficking, including "rubber bands, ripped pieces of U.S. currency, [and] at least twenty dryer sheets" (id. ¶¶ 13(a)-(b), (f));

(7) on March 28, 2016, at about 1:30 p.m., Agent Riley observed Valdez meeting with Montes de Oca inside the Kia and then saw Montes de Oca transfer a box from the Kia to his own car (id. ¶¶ 14(b)-(c); Hearing Tr. at 84-85, 477);

(8) on March 28, 2016, at about 3:40 p.m., Agent Riley participated in a stop of Montes de Oca's vehicle and found one kilogram of cocaine inside the box that Riley previously observed Montes de Oca move from Valdez's Kia to Montes de Oca's vehicle (Cmplt. (Dkt. No. 1) ¶¶ 14(e)-(n); Hearing Tr. at 86, 443, 477, 479); and

(9) on March 28, 2016, during a traffic stop of Valdez's Kia, a police dog alerted to a black book bag inside the Kia – which Agent Riley had observed Valdez carrying earlier in the day as he left the River Road Apartment – and to a hidden compartment in the Kia's rear cargo area.[4] (Hearing Tr. at 405, 458-61)

This information provided ample probable cause to believe – as of March 28,

2016[5] – that Valdez was a participant in a conspiracy to distribute cocaine.[6]

---

[4] Valdez argues that Detective King – who had participated in the seizure of cocaine from Montes de Oca's vehicle – was covered in "narcotics residue," and that his "presence at the scene" of Valdez's arrest is what caused the police dog to alert. (See Def. Post-Hearing Br. (Dkt. No. 63) at 17-18) Valdez has cited no evidence that supports this assertion, however. Although Detective Biondo spoke with King as soon as he arrived on the scene, their conversation took place before Biondo removed the police dog from his vehicle. (Hearing Tr. at 403) King also testified that he observed the canine search "[f]rom a distance." (Id. at 458) Moreover, when the police dog searched the interior of the Kia, the car doors were closed. (Id. at 421) In sum, there is no evidence that King's presence at the scene had any effect on the police dog's behavior. In any event, even if the canine search was set aside, there would still be ample probable cause for Valdez's arrest.

[5] Valdez also argues that – at the time of his arrest on March 28, 2016 – "the Government's claim to probable cause had already expired," because "no less than [six] and a half hours had already [e]lapse[d]" since Agent Riley had observed Valdez's drug transaction with Montes de Oca. (Def. Post-Hearing Br. (Dkt. No. 63) at 22) Valdez contends that the DEA "should have arrested and detained . . . [him] together with . . . Montes de Oca" earlier that day. (Id.) In light of the above information known to Agent Riley, however, probable cause still existed six hours after Valdez's transaction with Montes de Oca, and agents were still permitted to make a warrantless arrest of Valdez. See United States v. Viscioso, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) ("Probable cause to arrest must exist at the moment of arrest, but may be based on earlier behavior of the person arrested. A delay of a few hours or days between the alleged commission of a crime and the arrest does not in and of itself diminish probable cause. . . .").

[6] Valdez appears to dispute the validity of the traffic stop, because Detective Patti was not familiar with all aspects of the Valdez investigation. (See Def. Post-Hearing Br. (Dkt. No. 63) at 16) Although Agent Riley was most knowledgeable about the Valdez investigation, and Riley

### B.    Miranda Waiver

#### 1.    Applicable Law

"To protect the Fifth Amendment right against self-incrimination, the Supreme

Court in Miranda v. Arizona ruled that police may not interrogate a suspect who has been taken

into custody without first warning the person

> 'that he has the right to remain silent, that anything he says can be used against
> him in a court of law, that he has the right to the presence of an attorney, and that
> if he cannot afford an attorney one will be appointed for him prior to any
> questioning if he so desires.'"

United States v. Newton, 369 F.3d 659, 668 (2d Cir. 2004) (quoting Miranda v. Arizona, 384

U.S. 436, 479 (1966)). "If a suspect is not so warned, the prosecution is barred from using

statements obtained during the interrogation. . . ." Id.  "After giving a Miranda warning, police

may interrogate a suspect who has neither invoked nor waived Miranda rights." Berghuis v.

Thompkins, 560 U.S. 370, 372 (2010).

"'Even absent the accused's invocation of [his Miranda rights], the accused's

statement during a custodial interrogation is inadmissible at trial unless the prosecution can

establish that the accused . . . waived [Miranda] rights when making the statement.'" United

States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011) (quoting Berghuis, 560 U.S. at 382). "The

government bears the burden of demonstrating by a preponderance of the evidence that a

defendant waived his constitutional rights." United States v. Lynch, 92 F.3d 62, 65 (2d Cir.

1996) (citing United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)).

---

did not conduct the traffic stop and did not place Valdez under arrest, the Passaic County
Sheriff's officers who conducted the traffic stop and handcuffed Valdez were entitled to rely on
Agent Riley's information.  See United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001)
("Under the collective or imputed knowledge doctrine, an arrest . . . is permissible where the
actual arresting . . . officer lacks the specific information to form the basis for probable cause . . .
but sufficient information to justify the arrest . . . was known by other law enforcement officers
initiating or involved with the investigation.").

"The waiver inquiry, itself, has two 'distinct' components." Plugh, 648 F.3d at 127. First, the waiver must be "knowing," which means that "'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Id. (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Second, the waiver must be "voluntary." Id. "A voluntary relinquishment of a right occurs when the relinquishment is the 'product of a free and deliberate choice rather than intimidation, coercion, or deception.'" United States v. Male Juvenile, 121 F.3d 34, 41 (2d Cir. 1997) (quoting Moran, 475 U.S. at 421). Voluntariness is evaluated in light of "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials," to determine whether "the defendant's will was overborne by the [police officers'] conduct." Anderson, 929 F.2d at 99; see Lynch, 92 F.3d at 65 (applying this analysis to determine "[w]hether a defendant knowingly and voluntarily waived his rights"). "Coercive police activity is 'a necessary predicate' to finding that a waiver of Miranda rights was not voluntary." Coronado v. Lefevre, 748 F. Supp. 131, 139 (S.D.N.Y. 1990) (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)). "'The question of waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" Plugh, 648 F.3d at 127 (quoting United States v. Spencer, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam)).

"Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.'" Male Juvenile, 121 F.3d at 40 (quoting Moran, 475 U.S. at 421).

2.      **Analysis**

a.      **Interview at the Passaic County Sheriff's Office**

Agent Riley testified that – when Valdez was first brought into the interview

room at the Sheriff's Office – Riley

> told him he had the right to remain silent; anything that he said could and would
> be held against him in a court of law. He had a right to an attorney. If he could
> not afford one, one would be appointed to him at no cost, and he could stop the
> questioning at any time. And then [Riley] asked if he understood those rights. . . .
> [Valdez] said yes.

(Hearing Tr. at 38-39)[7] Detective King confirmed that Riley administered <u>Miranda</u> warnings at

the outset of the first interview and that Valdez "responded yes to all of them," indicating that he

understood his rights. (<u>Id.</u> at 465, 469-70) Both Riley and King testified that Valdez was "calm

and collected" during the first interview. (<u>Id.</u> at 39, 470)

Although Valdez testified that he was never advised of his rights prior to the

interview at the Sheriff's Office (<u>id.</u> at 172-73, 189-90, 252-53), this Court credits Riley and

King's testimony on this subject. During the later videotaped interview at DEA headquarters,

Riley says at the outset, "just like we did before, I'm just going to read you your rights again,

alright?" (GX 14 at 0:54-1:07) Valdez appears to understand Riley's reference to the earlier

---

[7] Agent Riley administered <u>Miranda</u> warnings in English, and both he and Detective King used
English in questioning Valdez. (Hearing Tr. at 39, 471) Riley testified that he "asked [Valdez]
if he understood English and if he could speak to me in English," and Valdez answered, "Yes."
(<u>Id.</u> at 39) During the interviews, Valdez responded to all questions in English and never
indicated any difficulty in understanding the agents. (<u>Id.</u> at 39, 471)

In five court appearances prior to the suppression hearing, Valdez never requested or used a
Spanish interpreter. (<u>See</u> Mar. 29, 2016 Tr. (Dkt. No. 21) at 1; Apr. 13, 2016 Conf. Tr. (Dkt. No.
12) at 1; May 23, 2016 Conf. Tr. (Dkt. No. 23) at 1; June 17, 2016 Conf. Tr. (Dkt. No. 30) at 1;
Oct. 4, 2016 Conf. Tr. (Dkt. No. 51) at 1; <u>see also</u> Hearing Tr. at 211-12) At the suppression
hearing, however, Valdez requested a Spanish interpreter (<u>see</u> Hearing Tr. at 4, 212), and he
went on to testify that the agents never asked whether he understood English. (<u>Id.</u> at 172)
Valdez also testified, however, that he "fully understand[s] English." (<u>Id.</u> at 176, 212)

administration of rights, and he does not object to or in any way question Riley's reference to the Miranda warnings administered at the Sheriff's Office.

This Court also finds that Valdez voluntarily waived his rights in speaking with Agent Riley and Detective King. "While the government bears the burden of demonstrating a knowing and voluntary waiver, such a waiver need not be express." Plugh, 648 F.3d at 127. "'[T]he law can presume that an individual who, with a full understanding of his . . . rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.'" Id. (quoting Berghuis, 560 U.S. at 385). Here, after receiving Miranda warnings at the Sheriff's Office, and after acknowledging that he understood his rights, Valdez spoke with Riley and King in a manner inconsistent with the exercise of those rights.

According to Riley and King, Valdez admitted, inter alia, that (1) he had provided Montes de Oca with a kilogram of cocaine earlier that day; (2) $100,000 in cash and drug paraphernalia were stored at his River Road Apartment; and (3) seven kilograms of cocaine were stored in a trap inside the Hyundai parked outside his apartment.[8] (Hearing Tr. at 40-42, 473-75) Valdez also provided the access code for the River Road Apartment building and he identified the keys for the River Road Apartment and the Hyundai. (Id. at 48, 473-75)

Although Valdez testified that he did not provide this information during the interview at the Sheriff's Office, his assertion is belied by the videotaped interview later conducted at DEA headquarters. The videotape shows Agent Riley reviewing with Valdez much of the information he provided at the Sheriff's Office, including his statements about (1) the PIN code for the River Road Apartment and how to access the trap in the Hyundai, and (2) the trash

---

[8] Agent Riley testified that, although Valdez stated at the Sheriff's Office that there were seven kilograms in the Hyundai's trap, the agents only found six kilograms. (Hearing Tr. at 68)

bag in the River Road Apartment containing $100,000 in cash. (GX 14 at 6:10-8:57; see also Hearing Tr. at 77-79) Valdez nods or says "mmhmm" as Agent Riley recounts Valdez's earlier statements, and at some points Valdez supplements the information he supplied earlier. (See GX 14 at 6:10-8:57) As Valdez concedes, he "never denied" the admissions recounted by Agent Riley. (Hearing Tr. at 78-79, 228-29, 235, 515)

Valdez asserts – without explanation – that his post-arrest statements at the Sheriff's Office were "coerced." (See Def. Moving Br. (Dkt. No. 39-1) at 2) There is no evidence that Valdez was threatened, intimidated, or otherwise had his will overborne during the first interview at the Sheriff's Office, however. Accordingly, there is "no reason to doubt the voluntariness of [Valdez's] waiver or the ensuing, inculpatory statements." Plugh, 648 F.3d at 128.

The Court concludes that Valdez knowingly and voluntarily waived his rights at the Passaic County Sheriff's Office. His motion to suppress the statements he made during this interview will be denied.

### b.  Interview at DEA Headquarters

Given the videotape of the second interview at the DEA's Manhattan office, there can be no dispute that Valdez received Miranda warnings. The video shows that, at the outset of the interview, Agent Riley read Miranda warnings to Valdez from a form, and then asked Valdez, "Do you understand your rights?" (GX 14 at 1:07-1:26) Valdez nodded his head and replied, "Yes." (Id.) Moreover, at the suppression hearing, Valdez admitted that he "understood all the rights that Agent Riley told [him] at the beginning of the interview," including that he had the right to remain silent and the right to an attorney. (Hearing Tr. at 239)

28

As to whether Valdez knowingly and voluntarily waived his rights in speaking with Agent Riley and Detective King, Valdez contends that he was "worried," "his mind was elsewhere," he was "in shock over what had happened," he "was just saying yes with [his] head [to] . . . follow[] the conversation," and he "wasn't . . . thinking straight." His "mind was not in the right place," and "had [he] known what [he] know[s] right now, [he] wouldn't have been there with the [agents]." (Hearing Tr. at 201-03, 222-23, 234, 238)

Accepting that Valdez (1) was concerned about and thinking about the consequences of his arrest during the interview at the DEA's offices, and (2) may well regret now that he made incriminating statements during his interview at DEA headquarters, there is no basis to find that his statements were involuntary. He is shown on video stating that he understands his rights, and he confirmed at the suppression hearing that he "understood [his rights] from the beginning." (Id. at 202-03, 239; see also GX 14 at 1:07-1:26)  "'Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.'" Plugh, 648 F.3d at 127 (quoting Berghuis, 560 U.S. at 384); see also United States v. James, No. 94 Cr. 750 (AGS), 1995 WL 330651, at *4 (S.D.N.Y. June 2, 1995) ("Miranda requires only that warnings be given and that the defendant understand the consequence of their waiver.").

It is undisputed here that Miranda warnings were administered before the interview at DEA headquarters, and by Valdez's own admission he understood his rights. Moreover, there is no evidence that the agents coerced Valdez into making any statements. Indeed, Valdez testified that Riley spoke to him "as if he were [his] friend." (Hearing Tr. at 223, 226, 228-30, 232, 238)  Valdez also testified that he understood Agent Riley's questions and answered them truthfully. (Id. at 226, 228-29, 233)  Nothing in the videotape suggests that

29

Valdez's mind was "elsewhere." He is responsive and appears focused on Agent Riley's questions and statements throughout the interview.

The Court concludes that Valdez knowingly and voluntarily waived his rights at the second interview at the DEA's Manhattan offices, and his motion to suppress the statements he made during this interview will be denied.

### C.   Consent to Search

#### 1.   Applicable Law

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).

> The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary. United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir. 1983). Voluntariness is a question of fact determined by a "totality of all the circumstances." Schneckloth, 412 U.S. at 227. "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) (quoting United States v. Sanchez, 32 F.3d 1330, 1334 (8th Cir.1994)); see Florida v. Jimeno, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

United States v. Isiofia, 370 F.3d 226, 230-31 (2d Cir. 2004).

In making a voluntariness determination, courts should consider the "age, education, [and] intelligence [of the defendant], [the] length of detention, [the] use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights." United States v. Puglisi, 790 F.2d 240, 243 (2d Cir. 1986) (citing Schneckloth, 412 U.S. at 226). "A person placed in official custody is not thereby rendered

incapable of giving his free and voluntary consent to a warrantless search." United States v. Moreno, 897 F.2d 26, 33 (2d Cir. 1990).

"[T]he government has no affirmative obligation to advise the defendant of his right to refuse consent to search; rather, that is one factor to be taken into account in determining voluntariness." United States v. Schaefer, 859 F. Supp. 2d 397, 407 (E.D.N.Y. 2012); see United States v. Drayton, 536 U.S. 194, 206-07 (2002) ("The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search."). Moreover, a defendant may consent to a search even if he has not been informed in advance of his Miranda rights. See Moreno, 897 F.2d at 33.

### 2.   Analysis

Agent Riley and Detective King testified that, during the interview at the Passaic County Sheriff's Office, Valdez provided both oral and written consent to search the River Road Apartment and the Hyundai parked outside the apartment.

After Agent Riley administered Miranda warnings to Valdez and interviewed him about his interactions with Montes de Oca that day, Riley asked Valdez about the River Road Apartment and the Hyundai. (Hearing Tr. at 40-41, 476-79) During this portion of the interview, Agent Riley "asked if [Valdez] would mind if [agents] searched both the apartment and the [Hyundai] Santa Fe. [Valdez] agreed, and that's when he told [the agents] what would be inside [the apartment and vehicle] and how to gain access." (Id. at 43; see also id. at 480-81) To document Valdez's consent, Riley prepared a handwritten consent form, which authorized the search of "65 River Rd, Apt 214, Nutley, NJ [and the] 2015 Hyundai Santa Fe [at] same." (Id. at 45, 95, 480, 482-84; see also GX 7) According to Riley and King, "[a]s [Riley] was writing [the

form], [he] was explaining to [Valdez] what [he] was doing," and that he was "writing out exactly what [Valdez] gave consent for on [the] piece of paper." (Hearing Tr. at 46-47, 484-85) Valdez then signed the form, and Riley and King signed as witnesses. (Id.) Riley next amended the Passaic County Sheriff's Office consent to search form – which Valdez had signed at the traffic stop to authorize a search of the Kia – to include authorization to search the River Road Apartment. (Id. at 56-58, 487; GX 3) Riley testified that he did this to "memorialize the consent . . . [onto a] more formal piece of paper," and that the changes were made in front of Valdez and explained to him. (Hearing Tr. at 56-58)

Valdez testified that he never gave consent to search either the River Road Apartment or the Hyundai parked at that location. (Id. at 175-77; see also Def. Moving Br. (Dkt. No. 39-1) at 2; Def. Post-Hearing Br. (Dkt. No. 63) at 24-25) Indeed, Valdez testified that he had never seen the handwritten consent form prepared by Agent Riley or the Passaic County Sheriff's Office consent to search form, and that his signature did not appear on either form. (Hearing Tr. at 162-63, 175-79, 195-96, 254-58) The notion that agents and officers forged Valdez's signature on these forms – and even on innocuous U.S. Marshal medical record release and property receipt forms (GX 15, 16; Hearing Tr. at 278-80) – and then perjured themselves in testifying about this subject, is not plausible, nor is Valdez's testimony on this point credible.

Valdez's consent to search was first sought at the traffic stop of the Kia, when Detective King asked Valdez whether he would "mind if [the agents] take a look in th[e] car." (Hearing Tr. at 447) Valdez consented to a search of the Kia, and King and Agent Riley then asked Detective Patti for a consent to search form. (Id. at 311) Before Detective Patti went to his patrol car to retrieve a consent to search form, he approached Valdez and asked whether he consented to search of the Kia. Valdez said "yes." (Id. at 311, 314-15, 346-47, 360-61)

Accordingly, Patti retrieved a Passaic County Sheriff's Office consent to search form from his vehicle, printed his name and the date on the bottom of the form, and handed the form to King and Riley. (Id. at 311-12, 346-47)  King then reviewed the form with Valdez, and both he and Detective Patti watched Valdez sign the consent form on the hood of a patrol vehicle. (Id. at 317-20, 451-54)  This Court finds Detective King and Detective Patti's testimony concerning the consent to search the Kia entirely credible, and rejects Valdez's testimony that he never signed the Passaic County Sheriff's Office consent to search form.[9]

This Court also accepts as credible Agent Riley and Detective King's testimony concerning Valdez's consent to search the River Road Apartment and the Hyundai.  Given Valdez's admissions concerning his drug trafficking during the first interview at the Sheriff's Office, it is logical both that the agents would have sought Valdez's consent to search his apartment and vehicle, and that Valdez would have granted consent.  To the extent that Valdez contends that agents forged his signature on the handwritten consent to search form, this Court rejects his testimony.  It is also worth noting that Valdez's consent to search his apartment and the Hyundai was contemporaneously documented in text message communications sent by Riley and King to other DEA Task Force members.  (GX 25 at 10-11)  It defies belief that King and Riley would have sent out misinformation to their Task Force colleagues about Valdez's consent.

Finally, the videotaped second interview at DEA headquarters further corroborates Agent Riley and Detective King's testimony that Valdez consented to the search of the River Road Apartment and the Hyundai.  In summarizing the admissions and statements Valdez made at the Passaic County Sheriff's Office, Riley notes that "[y]ou've been really

---

[9] Detective Patti, in particular, has no motive to lie about this issue.  He had no involvement in the underlying investigation of Valdez.  (Hearing Tr. at 305, 322-23)

honest so far. . . . [Y]ou gave us the consent and everything to get into the apartment and your car, and you gave us the keys." (GX 14 at 8:35-9:00; see also id. at 15:15-15:30, 17:00-18:05) In the video, Valdez does not object to or dispute Agent Riley's statement that he gave consent to search his apartment and the Hyundai. (Id.; see also Hearing Tr. at 78-79, 228-29, 235, 515) Riley and King both testified that Valdez was "calm, collected, [and] cordial" throughout their interactions on March 28, 2016 (Hearing Tr. at 43, 452, 470, 475, 489), and the videotape fully corroborates their testimony on this point.

The Court concludes that Valdez voluntarily consented to the search of the River Road Apartment and the Hyundai during the interview at the Passaic County Sheriff's Office. Valdez's motion to suppress the physical evidence recovered from the apartment and vehicle will be denied.[10]

---

[10]  Since the Court concludes that Valdez gave consent, it is not necessary to consider the Government's alternative arguments that the searches of the River Road Apartment and Hyundai were lawful under the inevitable discovery doctrine, or that the search of the Hyundai was lawful under the automobile exception.  (See Gov't Post-Hearing Br. (Dkt. No. 67) at 24-25)

## CONCLUSION

For the reasons stated above, Valdez's motion to suppress is denied.[11] The Clerk

of the Court is directed to terminate the motion (Dkt. No. 39).

Dated: New York, New York
       February 28, 2017

                         SO ORDERED.

                         _____
                         Paul G. Gardephe
                         United States District Judge

_____

[11] Valdez requests an order permitting him to make further motions as may be appropriate.
(Notice of Motion (Dkt. No. 39) at 1)

Federal Rule of Criminal Procedure 12(c) states that "[t]he court may . . . set a deadline for the
parties to make pretrial motions. . . . If the court does not set one, the deadline is the start of trial
. . . . If a party does not meet the deadline for making a [pretrial] motion, the motion is untimely.
But a court may consider the defense, objection, or request if the party shows good cause." Fed.
R. Crim. P. 12(c).

Here, at a June 17, 2016 conference, the Court set a July 7, 2016 deadline for pre-trial motions.
(See June 17, 2016 Tr. (Dkt. No. 30) at 2-3; Dkt. No. 26) Valdez does not explain why the July
7, 2016 deadline should be disregarded, nor does he identify any potential motions that he wishes
to bring. Accordingly, his motion is denied.