UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES of AMERICA

v.

Case #1 -16- CR -00266(PGG)

JEAN VALDEZ
    Petitioner

EMERGENCY MOTION
FOR COMPASSIONATE RELEASE

18 U.S.C.S. §3582 & BOP PROGRAM STATEMENT 5050.50 COMPASSIONATE RELEASE AND OR REDUCTION IN SENTENCE DUE TO EXTRAORDINARY AND COMPELLING CIRCUMSTANCES(COVID-19 CRISIS VULNERABLE/ AT-RISK/ NON-VIOLENT PRISONER PETITION FOR IMMEDIATE RELEASE TO HOME CONFINEMENT).

NOW COMES, the Above Petitioner Jean Valdez , who petitions the Honorable Court for Emergency Compassionate Release and immediate release to home confinement, pursuant to 18 U.S.C. §3582(c)(1)(A¹¹), beacause there are particular, Extraordinary and Compelling Circumstances that could not reasonably have been forseen by the court at the time of sentencing that warrant Compassionate /Reduction in Sentence, Pursuant to the Guidelines announced by Attorney General Barr on 3/25/2020, for the Immediate Release of Vulnerable At-Risk/ Non-violent Federal Prisoners due to the COVID-19 Virus Crisis. In support thereof, inmate states as follows:

Inmate is 40 years old. Inmate, On 3/28/2016, started his 135 month sentence. He has no history of sex offenses. He is Community/Out Custody Camper.
Inmate has served approximately 49 months, or approximately 46% of his net sentence with no infractions.

There are particularly extraordinary and compelling circumstances which could not have been forseen by the Court at the time of sentencing that warrant Compassionate Release/Reduction in Sentence to Immediate Home Confinement, specifically the life threatening progression of COVID-19.

Inmate suffers from the following conditions which, in addition to his age, make him More Vulnerable/ AT-Risk to serious consequences and Death from COVID-19 Virus:

Inmate is a Male which makes him 200% more likely to be infected and die from COVID-19 then women

INMATE IS AN HISPANIC AMERICAN WHICH MAKES HIM 300% MORE LIKELY TO BE INFECTED AND DIE FROM COVID-19.

Inmate has hypertension, HYPERTENSION***This AILMENT Greatly increases the Risk of Mortality should he contract The COVID-19.*** Inmate has Pulmonary issues and his family has many diabetics.

Inmates Prognosis from 'COVID-19' is POOR and Life Threatening.

Inmate has Severe Allergies and Extensive Pulmonary and Breathing issues

Inmate has Maternal and Paternal Chronic Health Issues

Inmate, when released , will live at 15 Manning Road, Paramus New Jersey, 07652  Inmate will live with his family who has lived there for over 1 years.

The inmate has no disciplinary violations while at Ft. Dix and has been a Model Prisoner and has completed over 750 hours of Re-entry classes in education, and continues with his 166 hours of monthly work programming.

The Inmate meets all the COVID-19 Crisis Vulnerable/AT-Risk Program guidelines outlined by the Attorney General by Memorandum to the BOP on March 26, 2020, then on April 3, 2020 Attorney General Barr directed the BOP to Immediately Review for Release to Home Confinement All At-Risk Inmates as per the Cares Act.
Additionally, on March 19,2020, March 25, 2020 , on March 26, 2020, and March 30,2020 The Leaders of the Senate and House Judiciary- Senators Charles Grassley, Richard Durbin, Cory Booker, Kamala

Harris and Congressman Hakeem Jefferies, Jerrold Nadler and Karen Bass's have urged the Attorney General and the BOP to "Release,Release" At-Risk/Non-Violent offenders and have put forward the "EMERGENCY COMMUNITY SUPERVISION ACT OF 2020" to Immediately place eligible inmates- 50 years and older, Pregnant, Diabetes, congestive heart failure or coronary disease, chronic lung disease or asthma, Immune system deficiencies such as HIV-CANCER-Sickle Cell Anemia and Individuals who have 12 months or less to serve on their sentence into Community Supervision and Home Confinement.

The Inmate in the first week of April, has submitted a letter to the Warden of Fort Dix requesting Home Confinement and Citing the Cares Act as well as asking the Warden seeking compassionate release Pursuant to the First Step Act and the Extraordinary and Compelling Circumstances of COVID-19. Exh #1

Petitioner Jean Valdez is currently incarcerated at FCI Ft. Dix in New Jersey, which is the site of the worst or most certainly One of the Worst outbreaks of COVID-19 in any Federal Prison. He suffers from a number of serious medical issues that put him at high risk of severe medical consequences were he to contract the virus. As a result, Petitioner has filed an administrative request with the BOP Director Michael Carvajal, Attorney General Barr, FCI Fort Dix Warden -David Ortiz and Fort Dix Case Manager McCollum as well as this Emergency Motion for Compassionate release, pursuant to 18 U.S.C. § 3582(c), with this Court.

The BOP has instituted a Policy that all inmates granted Compassionate Release, must remain in custody during this peak of the Pandemic for what it labels a "14-day quarantine"-but petitioners' current confinement is neither a quarantine nor limited to 14 days. In fact, all inmates 14-day-clock must start over whenever any of the people that he is now housed with test positive with Covid-19. Under the BOP's policy, if any one of the

individuals in Mr. Valdez unit, test positive, the 14-day-waiting period for all inmates starts anew. The BOP despite the Express Authority from the Attorney General to do so, the BOP has not and will not consider permitting Mr. Valdez to self-quarantine in his residence for 14 days.

Given this dangerous set of conditions, Mr. Valdez presses the court to Grant his still pending motion for compassionate release and order him immediately released on conditions that include a 14-day period of self-isolation in his home.

The barrier to this Courts' acting immediately, however, is that Mr. Valdez has not exhausted his administrative remedies, however, another Court in this District issued a decision reached a decision in United States v. Russo, No. 16-cr-441(LJL),2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020). As Justice Frankfurter warned: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." Henslee v. Union Planters Nat.Bk & Tr. Co.,335 U.S. 595, 600 (1949)(Frankfurter, J., dissenting).

I. BACKGROUND:

As stated earlier, Inmate is 40 years old. On 3/28/2016 inmate started his 135 month sentence for Narcotics Conspiracy

Mr Valdez is currently serving his sentence in FCI Fort Dix Camp in New Jersey. On April , 2020, he filed a Motion for Compassionate release. Mr Valdez seeks Compassionate release because his underlying health conditions make him Highly Vulnerable to COVID-19. Inmate suffers from high blood pressure, Severe Allergies, and he therefore contends that he is susceptible to serious injury or death if he contracts the disease. Given recent conditions with [the] COVID-19 pandemic and due to his hypertension and other medical issues, Mr Valdez ] is at high risk for COVID." also relied on statistics regarding the spread of COVID-19 at FCI

Fort Dix, Camp, which are even more shacking then what is reported. As of April 29, 2020, FCI Fort Dix Camp with a population of approximately 240, has tested about 200 inmates and 52 of those have COVID-19, and the Unit Manager Brinson as well as the Kitchen CO are discussing their amazement that the Administration at Fort Dix Camp are Fudging the numbers and once they test the entire camp they will see an infection number of over 70% and the real numbers are likely Higher.

The BOP has represented that FCI Fort Dix Camp is "quarantining" all inmates who will be released on home confinement for 14 days before their release, pursuant to "current directives of the Attorney General." Mr Valdez however contends that this purported "quarantine" is no quarantine at all. Mr Valdez although not designated to be released to home confinement, remains in regular and close contact with all other inmates- designated home confinement and regular-. He lines up with all other inmates in close proximity in order to receive food , phone calls, emails , communal showers/bathroom facilities, hallways and dormatory living. In fact Mr Valdez has lived in a dorm that typically has had 100 inmates and instead of social spacing the Unit Team moved the majority of the camp to the one side and had approximately 184 inmates on the same side as Mr Valdez and the infection percentage has become 'Off the Charts', inmates passing out on the floor, so bad that inmates were filming the living conditions and 6-News in New Jersey televised the video..Mr Valdez therefore asks to quarantine in his home in Paramus, New Jersey where it is undisputed that he can safely distance from members of his family and the public and receive medical care if necessary.

On April 17, 2020, the Second Circuit noted that the Guidance from the Attorney General, which the Bureau of Prisons uses to justify its quarantine requirement, also provides the BOP with discretion to immediately release inmates who have been approved for home confinement, so that they may quarantine at home instead of the facility at which they are incarcerated. See William P. Barr,

Attorney General, Memorandum for Director of Bureau of Prisons: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, at 1(Apr.3, 2020).

The Second Circuit United States v. Gerard Scparta, 18-cr-578(AJN), attached Exh#2, the plain absurdity of the Bureau of Prisons' policy. Under this policy-which, as far as the Court is aware, is not mandated by any statute, regulation, or informal guidance issued by the Attorney General-many inmates who are on the cusp of relief to home confinement to protect them from COVID-19, which is spreading rampantly at FCI Fort Dix Camp, are housed together in close quarters all the time. No testing for COVID-19 is done before any specific group is put into quarantine, in fact once the BOP quarantined approximately 60 inmates, after 14 days they tested those inmates and saw that over 40 % have COVID-19. Then in quarantine or general Camp population, if any inmate in the unit tests positive, the 14-day clock for every individual quarantine starts anew. See id. If somehow 14 days go by for an inmate with no other inmate showing symptoms of COVID-19, the inmate will be released without testing. The senselessness of this policy is laid bare by Two undisputed scientific facts: (1) individuals who are asymptomatic are capable of spreading COVID-19, and (2) individuals infected with COVID-19 may not show any symptoms for days. See Centers for Disease Control and Prevention, Corona Virus 2019, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html. As is noted by the BOP FCI Fort Dix Camp has about 50 confirmed cases of COVID-9, and because testing is severely limited, the actual numbers are certainly far higher. In these circumstances, community spread through individuals not showing symptoms is inevitable, including in units of inmates who have been approved for home confinement. The BOP's policy therefore makes it likely that inmates approved for home confinement will not be released; as the virus spreads in the unit, the 14-day clock will repeatedly restart, perpetually prolonging incarceration. If they are released, they may well be positive and asymptomatic, thus endangering the broader community.

The Court speaks in stark terms: this is illogical and self-defeating policy that appears to be consistent with the directive of the Attorney General, ungrounded in Science, and a Danger to Mr. Valdez and the Public Health of the community.

II. DISCUSSION

"Federal Courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed,' 18 U.S.C. §3582(c); but the rule of finality is subject to a few narrow exceptions." Freeman v. United States, 564 U.S. 522, 526(2011). The compassionate-release statute creates one such exception: It allows a court to "reduce" a term of imprisonment, after considering the factors set forth in 18 U.S.C. §3553(a), if" it finds that....extraordinary and compelling reasons to warrant such a reduction...and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. §3582(c)(1)(A)(i). Under the recently enacted First Step Act, defendants serving their sentence may move the court for compassionate release. Gotti, 2020 WL 497897, at *2; United States v. Gross, No. 15-CR-769(AJN), 2020 WL 1673244, at *2(SDNY APr6, 2020). Mr. Valdez has filed such a Motion.

A. The Court Excuses Mr. Mr Valdez's Failure to Exhaust

Before a compassionate-release motion can be considered on the merits, the defendant must exhaust administrative remedies. The First STep Act provides that Courts can consider compassionate-release motions brought by incarcerated defendants only if one or Two requirements is met. First, courts can consider such motions "after the defendant has fully exhausted all administrative rights to appeal a failure of the bureau of Prisons to bring a Motion on the Defendants behalf". 18 U.S.C. §3582(c)(1)(A). Second, courts can consider such motions after "the lapse of 30 days from the receipt of such a request by the Warden of the defendant's facility." Id.

Since this Court issued its decision on exhaustion in Gross, Judge Lewis Liman published a persuasive opinion on the same subject. See United States v. Russo, No. 16-cr-441 (LJL), 2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020). In that case, the defendant similarly suffered from "serious medical ailments that put him at high-risk for contracting COVID-19 and for very serious medical consequences should he contract it," and he therefore sought compassionate release. Id. at *1. And just as here, the defendant did not exhaust his administrative remedies. See id. at *3. Judge Liman noted that the Supreme Court and Second Circuit have applied equitable exceptions to mandatory claims-processing rules like this one, and concluded that the text, history, and purpose of the First Step Act counsel in favor of finding the requirement amenable to such exceptions. Id.

In United States v. Gerard Scparta #18-cr-578(AJN), Judge Alison J. Nathan is persuaded by Judge Liman's well reasoned decision. To begin, even the Government concedes that this statutory requirement is subject equitable exception: waiver. That is, the Government is of the view that it can waive exhausion, but not the court. Indeed, the Government has waived compliance with the exhaustion requirement in compassionate-release motions in this very District. See, e.g., United States v. Knox, No. 15-cr-445-12(PAE). And the Supreme Court has "reserved [decision on the question] whether mandatory claim-processing rules may be subject to equitable exceptions" other than waiver and forfeiture. Hamer v. Neighborhood Hous. Servs. of Chicago, 138 S. Ct13, 18 n.3(2017). The Supreme Court has also held that mandatory statutory rules analogous to the one here, can be subject to certain equitable exceptions.

The insight of Judge Liman's recent decision is that the Second Circuit has provided more clear guidance, stating that "claim-processing rule[s]" are "subject to equitable considerations such as waiver, estoppel or futility." Paese v. Hartford Life & Acc. Ins.Co.,449 F.3d 435,443 (2nd Cir. 2006). In particular, the Second

Circuit has applied this principle to statute of limitations and deadlines contained in the Federal Rules, holding exceptions exist to facially unequivocal time cutoffs. See, e.g., Weitzer v. Cynosure, Inc., 802 F.3d 307,31 (2d Cir. 2015), as corrected (Oct. 27, 2015)(determining that the "28-day time limit of FRAP Rule 4(a)(4)(A)(vi)...should be considered a 'claim processing rule,' which is subject to equitable exception or waiver"); Grewal v. Cuneo Gilbert & LaDuca LLP, 2020 WL 897410 (2nd Cir. Feb. 25, 2020)("We have held that Rule 4(a)'s 28-day deadline is not jurisdictional, but is a 'claim-processing rule' and, as such, its enforcement is subject to waiver, forfeiture, and other equitable exceptions."); see also Fed. Ins. Co. v. United States, 882 F.3d 348,361 (2nd Cir. 2018)("Claim-processing rules, much like statutes of limitations,... may be subject to equitable tolling doctrines."). These cases, which the Court did not consider in its prior decision, counsel in favor of holding the First Step Act's exhaustion requirement amenable to judicial exception. The Supreme Court analyzed the PLRA's text and legislative history and concluded that its exhaustion requirement foreclosed judicial exceptions.

Here, the Court must determine whether Congress evinced an intent for the First Step Act's exhaustion requirement to admit exceptions. See McCarthy v. Madigan, 503 U.S. 140,144 (1992)(noting that congressional intent is "paramount" in determining whether a particular statute's exhaustion regime is amenable to exception); Russo, 2020 WL 1862294, at *6(framing this inquiry as one centered on congressional intent. As the Court discussed above,Section 3582 provides that a defendant can exhaust either by completing the agency's internal process or if the agency fails to act for 30 days. Judge Rakoff succinctly explained this provision in Haney: "[T]he statute does not necessarily require the moving defendant to fully litigate his claim before the agency(i.e., the BOP) before bringing his petition to court. Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before

filing a motion in court." Haney, 2020 WL 1821988, at *3

Put simply, this an exhaustion requirement like no other of which the Court is aware. Accord id. ("§3582(c)(1)(A) does not contain an exhaustion requirement in the traditional sense."); Russo, 2020 WL 1862294, at *6 (noting that this provision is "distinctive"). And as the Supreme Court has already stressed, courts analyzing statutes must pay attention not just to the particular word, phrase, or provision at issue in the case, but instead how Congress legislates across the entire corpus juris, such that like provisions are treated in pari materia and dissimilar provisions are treated differently. See generally United States v. Ressam, 553 U.S. 272, 277 (2008).

As to the Timeliness requirement, however, the Supreme Court and Second Circuit have often applied equitable exceptions to otherwise unforgiving time requirements, strongly supporting the conclusion that they apply here too. See Holland, 560 U.S. at 649 (applying equitable exception even though text did not permit such an exception); Paese, 449 F.3d at 443.

The title of the First Step Act's provision that enacted this exhaustion regime is "Increasing the Use and Transparency of Compassionate Release." Pub. L. No. 115-391 Stat. 5339 (2018). In this case, construing the exhaustion requirement strictly would serve neither of these aims. Without the application of equitable exceptions, prisoners bringing compassionate-release motions due to Covid-19 may never obtain timely judicial review before the virus takes its toll. The BOP's internal administrative process is lengthy, exhaustion regime could take weeks, if not months. The statute's plain text--both its distinctive structure and its title--therefore supports application of equitable exceptions.

In sum, the First Step Act's text, history, and structure all counsel in favor of concluding that the statute's exhaustion requirement is amenable to equitable exceptions. And here, waiting for Mr Valdez to exhaust his remedies would both be futile and

cause him irreparable harm. For Mr Valdez to wait an additional two weeks (until 30 days lapse under the First Step Act's exhaustion requirement) could be the difference between life and death--and if he falls seriously ill or dies, he would have suffered irreparable harm and his motion seeking release would be futile. Accord Perez, 2020 WL 1546422, at *3 ("Here, even a few weeks' delay carries the risk of catastrophic health consequences for Perez.) For these reasons, the Court must excuse Mr Valdez's failure to exhaust administrative remedies.

B. THE DEFENDANT HAS SATISFIED ALL OTHER REQUIREMENTS FOR COMPASSIONATE RELEASE

Given that administrative exhaustion does not bar Mr Valdez's request, the Court now must consider the merits of his motion. To award Mr Valdez relief the seeks, the Court must find that "extraordinary and compelling reasons warrant" compassionate release. 18 U.S.C. §3582(c)(1)(A)(i). The Court must also consider the factors set forth in 18 U.S.C. §3553(a). Id. §3582(c)(1)(A). And the Court must find that release is consistent with the Sentencing Commission's policy statements. Id. §3582(c)(1)(A)(i). Because this Court sentenced Mr Valdez, the Court is intimately familiar with how these factors apply to his circumstances.

The Court considers whether extraordinary and compelling reasons warrant such a reduction [in sentence]... and such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).
As this Court has seen , the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals. See, e.g., United States v. Stephens, 2020 WL 1295155; Gross, 2020 WL 1673244 ("we are not living under normal circumstances"); accord United States v. Nkanga, No. 18-CR-713 (JMF),2020 WL 1673244, at *3 (quoting United States v. Russo, No. 16-cr-441 (LJL), Dkt. No. 54 at 5(S.D.N.Y. Apr. 3, 2020). Moreover, Mr Valdez suffers from multiple medical issues that make him especially vulnerable to

complications from COVID-19. Specifically Mr Valdez suffers from hypertension, Allergy and other pulmonary issues as well as Hispanic American. The Centers for Disease Control has identified hypertension as a comorbidity that increases the likelihood of serious risk from COVID-19. In addition, given the non-violent nature of the offenses at issue and Mr Valdez's service to his Family, this the Court has little reason to think Mr. Valdez poses any risk to the public. These factors taken together are extraordinary and compelling, and are therefore sufficient to warrant compassionate release. See, e.g., United States v. Sawics, No. 08-CR-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10,2020)(concluding that, because the defendant suffered from hypertension, he was vulnerable to COVID-19 and thus "the risk of serious illness or death that he faces in prison constitutes an extraordinary and compelling reason militating in favor of his release."), See, e.g., United States v. Scparta, No. 18-cr-578 (AJN) at (S.D.N.Y. 4/19/2020). Inmate has cited Hypertension, serious pulmonary issues and he has not gotten responses to any. On April 10,2020, in the Second Circuit, District Court reviewed the case United States v. Sawicz, 08-cr-287(ARR)(E.D.N.Y. Apr. 10, 2020), and although the Petitioner did not Exhaust all administrative rights and rights of appeal as discussed. The Court waived the exhaustion requirement in the Saweicz case as we are requesting here, because as the Court in the Second Circuit found , "Even where [administrative] exhaustion is seemingly mandated by statute or decisional law, the requirement is NOT ABSOLUTE. "Washington v. Barr, 925 F.3d 109, 118 (2nd Cir. 2019). The Court went on to say that "A Court may waive an administrative Exhaustion requirement where [exhaustion] would be futile...where the administrative process would be incapable of granting adequate relief...[or] where pursuing agency review would subject [the person seeking relief] to undue prejudice.'" [U]ndue delay, if it in fact results in catastrophic health consequences," can justify waiving an administrative exhaustion requirement for any of those three reasons." Id. at 120-21. Here the Court determined that the COVID-19 outbreak at FCI Danbury combined with Sawicz's risk of

suffering severe complications because of his hypertension justified waiver. "The delay that the defendant would experience if he had to wait for thirty days to expire before pursuing a Motion for Compassionate release in this Court would put him at significant risk of suffering catastrophic health consequences." Therefore, as shown here with Inmate Mr. Valdez , # 75830-054 ., Inmate has substantial health risks to COVID-19 and as with the (Sawicz) case, Mr Valdez has completed a percentage of his sentence and is eligible for Home Detention on November 2025.

Wherefore, for the foregoing reasons, the above inmate requests Compassionate Release and Immediate Release to Home Confinement.

Respectfully submitted,

_____
Jean Valdez # 75830-054

Date: 5/12/2020

CERTIFICATE OF SERVICE

I, Jean Valdez, hereby certify that a copy of the foregoing Motion has been served upon the US Attorney for my case by depositing a copy of the same in the prisoners-US Mail Box, First Class, Postage Pre-paid, addressed as follows:

Assistant US Attorney
Sugar Kananur Ravi
U.S. Attorney's Office S.D.N.Y.
One St. Andrews Plaza
New York, NY  10007

_____           Dated: 5/10/2020
Jean Valdez #75830-054

**MEMO ENDORSED:**

The application for compassionate release is denied. Valdez pled guilty to conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. (Plea Tr. (Dkt. No. 98)) On October 20, 2017, this Court sentenced him to 135 months' imprisonment. (Sentencing Tr. (Dkt. No. 116) at 31) Valdez is currently being held at a prison camp located at FCI-Fort Dix. (Govt. Opp. (Dkt. No. 126) at 9) His projected release date is November 12, 2025. (Id. at 2)

In a May 10, 2020 submission, Valdez contends that he is entitled to compassionate release pursuant to 18 U.S.C. § 3582 because of risks to his health presented by the COVID-19 virus. (Def. Mot. (Dkt. No. 124)) Valdez claims that – in an early April 2020 letter – he asked the warden of FCI-Fort Dix to move for his release, pursuant to 18 U.S.C. § 3582. (Id. at 3) The prison has no record of this letter, however, and the Government argues that Valdez has not exhausted his administrative remedies. (Govt. Opp. (Dkt. No. 126) at 5-9)

Even if Valdez had exhausted his administrative remedies, his application for compassionate release fails on the merits. All inmates in Valdez's camp at FCI-Fort Dix were tested for COVID-19 between April 22 and May 6, 2020. (Id. at 9) Those who tested positive were moved to an isolation unit. (Id.) Valdez tested negative and is housed only with other inmates who tested negative for the virus. (Id.) There have been no positive tests at Valdez's camp since May 6, 2020. (Id.) Given these circumstances, the Court concludes that Valdez's risk of contracting the COVID-19 virus is low. Although Valdez – who is 40 years old – claims to suffer from hypertension, severe allergies, and "Pulmonary issues," and cites a family history of diabetes (Def. Mot. (Dkt. No. 124) at 2), the Presentence Investigation Report ("PSR") states that Valdez told the Probation Office that he "enjoys good physical health." (PSR (Dkt. No. 120) ¶ 68) Prison medical records reflect that – as recently as December 2019 – Valdez denied suffering from allergies, diabetes, hypertension, or respiratory issues. (Govt. Opp. Ex. A at 14) Given that Valdez committed perjury at a suppression hearing before this Court (see Sentencing Tr. (Dkt. No. 116) at 16), his unsubstantiated claims of medical conditions – which contradict statements he made both to the Probation Office and prison medical personnel – are entitled to little weight.

Finally, Valdez has not demonstrated that he would not present a danger to the community if released. He participated in a conspiracy that involved 50 to 150 kilograms of cocaine. (Id. at 10, 12) He used vehicles with trap compartments to transport cocaine between New Jersey and New York nearly every day for several months. (Id. at 26; PSR (Dkt. No. 120) ¶¶ 14-18, 29, 34) Law enforcement officers recovered approximately $120,000 in cash at Valdez's residence. (Sentencing Tr. (Dkt. No. 116) at 127) In sum, there is compelling evidence that Valdez's release at this time would compromise the safety of the community.

For all these reasons, Valdez's application for compassionate release is denied. See United States v. Eric Fernandez, No. 12-CR-844 (AJN), 2020 WL 3034799, at *3 (S.D.N.Y. June 5, 2020) (denying compassionate release motion of 51-year-old Fort Dix inmate with hypertension and diabetes in part because he "played a significant role in trafficking a very large amount of

cocaine" and "served only roughly half of his sentence"). A copy of this memo endorsement will be mailed to Defendant by Chambers.

SO ORDERED.

*Paul G. Gardephe*

Paul G. Gardephe
United States District Judge

Dated: June 9, 2020