UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES

v.                                                                  1:16-CR-00266-PGG

JEAN VALDEZ

---

### MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 USC 3582 (c)(1)(A)

I, Jean Valdez, pro se, respectfully move the Court to reduce my sentence pursuant to 18 USC 3583 (c)(1)(A) for extraordinary and compelling reasons. I am a 40 year old man and I suffer from Obesity (BMI > 30), and Hypertension. My medical conditions place me in a vulnerable, at-risk population should I contract Covid-19. These serious underlying conditions, combined with the growing Coronavirus pandemic, especially the out-of-control outbreak at Fort Dix, and my demonstrated active growth toward rehabilitation, provide an extraordinary and compelling basis for a sentence reduction.

I request that the Court reduce my sentence to time-served, or, in the alternative, modify my term of supervised release such that I may serve the remainder of my sentence in Home Confinement, where I would be less likely to suffer serious illness or even death and would simultaneously protect the public.

### FACTUAL BACKGROUND

On June 19, 2017, this Court accepted my guilty plea to Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, a violation of 21 USC 846 & 841 (b)(1)(A) and sentenced me to 135 months of imprisonment followed by 60 months of supervised release.

I have served almost 5 years of my sentence and am currently housed at Fort Dix Minimum Security Prison Camp (the "Camp). My home detention eligibility date is May 12, 2025.

Between September 28, 2020, and October 29, 2020, the Federal Bureau of Prisons ("BoP") made a conscious and reckless decision to transfer scores of inmates from Covid-19 ravaged FCI Elkton (Ohio) to FCI Fort Dix. All of these inmates transferred to FCI Fort Dix had either been exposed to the deadly virus or were infected by it. Within weeks, FCI Fort Dix was experiencing and continues to experience, a severe Coronavirus outbreak, with more than 200 inmates in a single Unit being infected. Despite the outbreak, the BoP has effectively refused to test all inmates within the institution for the virus, fostering the spread of the very disease that it introduced into the institution. Notably, members of Congress recently penned a letter to Michael Carvajal, Director of the Bureau of Prisons, decrying the reckless disregard for human life.

The second wave of the virus occurred right before the end of November, in total 350 men were tested positive in that wave. The inability of the BoP and staff at Fort Dix to control the virus would become even more evident during the third wave. I have watched as the number of sick men at Fort Dix has climbed from 17 in Mid-December to 150 by Christmas Eve, 295 on New Year's Eve, 590 by the Fourth and 789 on January 10. Altogether more than half of the 2749 inmates have been infected by Covid-19.

The Camp has seen equally terrifying numbers. Sixty five of the 136 men housed at the Camp are currently positive. The staff dragged out their response to the news that a Kitchen Correction Officer (CO) was sick to such a degree that all the men currently negative have spent at least five days locked in a dormitory in bunk beds three feet apart from the men who eventually tested positive.

It is through sheer luck that Fort Dix has not already had a fatality because of the pandemic. These serious conditions, combined with the growing Coronavirus pandemic, and my demonstrated active growth toward rehabilitation, provide an extraordinary and compelling basis for a sentence reduction.

LEGAL ARGUMENT

On December 21, 2018 the First Step Act of 2018 ("FSA") was enacted into law. Among several criminal justice reforms, the FSA makes fundamental changes to how federal compassionate release functions. See First Step Act of 2018, 603(b), Pub L. No. 115-391, 132 Stat. 5194, 5239 (2018). Notably, Congress amended 18 USC 3582(c) (1) (A) by permitting the sentencing court to entertain motions for compassionate release filed by defendants. Id.

The FSA allows me to appeal directly to the court for compassionate release when: (1) I have exhausted all administrative rights of appeal to the Bureau of Prisons ("BoP"); (2) extraordinary and compelling reasons warrant such a reduction; (3) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission"; and (4) after considering the factors set forth in 18 USC 3553(a).

On March 13, 2020. the President declared Covid-19 a pandemic of sufficient severity and magnitude to warrant an emergency declaration pursuant to section 501 (b) of the Disaster Relief and Emergency Assistance Act. In response, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act which the President signed into law on March 27, 2020. Among other things, the CARES Act included a provision giving the Attorney General and the BoP authority to expand the use of home confinement during the covered emergency period. Both the Executive and Legislative branches of the Government declared their intent to reduce the prison population by expanding home confinement and "immediately maximize appropriate transfers to home confinement of all appropriate inmates held at...facilities where Covid-19 is materially affecting operations." See Attorney General Barr's Memorandum for Director of Bureau of Prisons, April 3, 2020.

1. EXHAUSTION

As a prerequisite of judicial relief, the FSA requires that the court may consider a motion brought directly by a defendant "after the defendant has exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier..." 18 USC 3582(c)(1)(A)(i).

In April 2020, I sent a letter to Warden David Ortiz requesting that the BoP move this Court to release me to home confinement pursuant to 18 USC 3582 (c)(1)(A). To date I have received no reply.

I have exhausted my administrative remedies and this matter is correctly before the Court.

2. EXTRAORDINARY AND COMPELLING REASONS

Many Federal Courts have concluded that 'extraordinary and compelling' circumstances exist when an incarcerated defendant suffers from health conditions that make him particularly susceptible to serious complications should he contract Covid-19. See e.g. United States v. Estrella, No. 2:15-CR-32-GZS, (June 16, 2020) p.3 ECF #46; United States v. Christian, No. 2:13-CR-96-NT, (May 6, 2020) ECF #80.

The Department of Justice generally agrees that an inmate who suffers from the chronic conditions recognized by the CDC with the high risk of severe illness from Covid-19 may be eligible for compassionate release. See Wise v. United States, No. CR-ELH-18-72; 2020 WL 2614816, at *7 (D MD May 22, 2020);United States v Wright, No. CR-TDC-17-0388, 2020 WL 2571198, at *3 (D MD May 21, 2020)("government now agrees that inmates diabetes condition, and perhaps other medical conditions, could constitute 'extraordinary and compelling reasons'");United States v. Atkinson, 2020 WL 1904585, at *3 (D NEV April 17, 2020)("presence of Covid-19...necessitates more expansive interpretation of self-care to include Covid-19 vulnerability coupled with inability to practice CDC recommended safeguard procedures"); United States v. Esperanza, 2020 WL 1696084, (D IDAHO, April 7, 2020)(Same); See also Government's Response in Opposition to Defendant's Motion to Reduce Sentence Pursuant to 18 USC 3582 (c)(1)(A), United States v. Hird, No. 2:13-CR-39-TJS, Dkt. No. 650 (ED PA May 19, 2020) (Government concession that "the risk of Covid-19" to a vulnerable inmate "presents a serious physical or medical condition...that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility.")

Simplifying this issue, the Department of Justice has "direct[ed] the United States to concede extraordinary and compelling reasons exist when defendants present certain health conditions, including those in the Centers for Disease Control and Prevention's high risk groups." United States v. Adeyemi, 2020 WL 3642478, at *10, n. 121 (ED PA July 6, 2020).

I contend that the Court may find that "extraordinary and compelling reasons' exist due to (A) the Covid-19 virus and how the BoP is handling it, (B) how the virus is affecting FCI Fort Dix, and (C) the vulnerability I have based on my chronic medical condition.

(A) Covid-19 and the Bureau of Prisons

As of January 23, 2021, the BoP has reported 206 inmate deaths and three staff deaths within the Federal Prison system, as well as 4,054 positive cases among inmates and 1,977 staff (up 16% and 32% from the prior week), 39,732 inmates and 3,792 staff have recovered. See Covid-19 Cases, BoP (January 23, 2021) https://www.bop.gov/coronavirus/.

Covid-19 is tearing through the BoP facilities like wildfire. It has been reported that incarcerated individuals are being infected at a rate more than 6.5 times higher than in the United States. See Federal Defenders of New York, BoP-Reported Positive Tests for Covid-19 Nationwide, https://federaldefendersny.org.

In the United States, an estimated 2.1 million adults are housed within approximately 5,000 detention facilities on any given day. See Bureau of Justice Statistics, Key Statistic: total correctional population, https://bjs.gov/index.cfm?ty=kfdetail&iid=487.

Needless to say, these facilities face significant challenges in adequately addressing the spread of highly infectious pathogens such as Covid-19. See Wallace M, Hagan L, Curran KG, et al., Covid-19 in Correctional and Detention facilities, CDC Morbidity and Mortality Weekly Report (May 15, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm.

Such challenges include "crowded dormitories, shared lavatories, limited medical and isolation resources, daily entry and exit of staff members, continual introduction of newly incarcerated or detained persons, and transport of incarcerated or detained persons in multi-person vehicles for court-related, medical or security reasons." See Bick JA, Infection Controls in Jails and Prisons, Clin Infect Dis 2007; 45:1047 55. Also see CDC Interim Guidance on Management of Coronavirus Disease 2019 (Covid-2019) in Correctional and Detention Facilities, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correction-detention.html.

Prisons have been hit particularly hard by the pandemic, as they present numerous environmental factors favorable to the spread of the virus. See United States v. Rodriguez, No. 03-271, 2020 WL 1627331, at *1, 8-9 (ED PA April 1, 2020) ("Prisons are tinderboxes for infectious disease.")

(B) Fort Dix

I am currently housed in an open air dormitory containing 86 men cramped in 104 bunks. Due to the lockdown policies of the BoP, I spend an average of 18 hours a day restricted to that dormitory, while only being allowed outdoors for 3 hours per week. I live, eat, and sleep less than 6 feet away (the CDC's minimum for 'social distancing') from 5 other men. We have no religious services, no programming, only self-study education (which I participate in), and extremely limited

medical services (there is no Doctor assigned to the Camp). When not locked in my dorm, my activities are limited to watching TV or working out, Fort Dix is no longer a Correctional Institution, it is a warehouse.

On January 23, 2021, the BoP Fort Dix website lists 120 positive cases of Covid-19 among inmates and 29 staff. Ft. Dix also reported its first fatality ON January 22nd. The BoP also reports 1308 inmates and 45 staff recovered, but that number does not include prisoners no longer at Fort Dix. The reality is that Fort Dix Minimum Security Camp housed 230 people on April 1, 2020, and 58 of them, fully 25% contracted the disease. See Wragg v. Ortiz, 20-CV-05496 (D NJ), Dkt. No. 1.

On December 24, 2020, a new wave of cases began at the Fort Dix Minimum Security Camp. On the 23rd, the primary daytime kitchen CO called out sick with a positive Coronavirus test. Already men at the Camp were experiencing sick. On the same day, an inmate went to the medical office complaining of Covid-19 related symptoms and was told to "come back tomorrow." That inmate wrote an internal email to Dr. Turner-Foster, and at least one other inmate wrote to an assistant warden explaining that several members of the inmate kitchen staff were ill. On the 24th, for the first time in four months, temperature checks were performed in the A-Wing, one of the two open-air dormitories in the Camp. All food preparation for the entire Camp is being performed by men in the A-Wing. Three men had elevated temperatures and were subsequently tested positive for Covid-19. The A-Wing was locked, and the men were confined to the dormitory for 22 hours per day.

On December 28, 2020, all inmates in the A-Wing were tested for the virus and sent back to their dormitory for three days to await the results. By the time those results were reported, the men of A-Wing will have spent eight days sleeping, eating, and living in bunks less than four feet apart awaiting a diagnosis for a potentially deadly disease in an environment where "social distancing is impossible." It would not be a surprise if the number of sick men escalates dramatically. As of December 30, the B-Wing men have not been tested.
Between May 7, 2020, and October 1, 2020, no testing was done at Fort Dix, the largest single prison facility in the BoP. Yet, the BoP has the audacity to suggest that the virus is well-controlled.

Additionally, there have been numerous reports that conditions at Fort Dix are contributing to the spread of the disease. These circumstances caused the ACLU of New Jersey to file a lawsuit on behalf of medically vulnerable inmates at Fort Dix. Id. One news article about the lawsuit states the following:

> A 75 year-old food server visibly ill with Covid-19 continued working for days. Empty soap dispensers and no paper towels. A senior staff member spraying a collapsed prisoner with disinfectant before removing his mask, which contained blood and green vomit.
> These are some of the condition's inmates at Federal Correctional Institution at Fort Dix in Burlington County described living through in the past month, since the first case of the coronavirus was identified in early April....

> "FCI Fort Dix is speeding toward a public health catastrophe." said ACLU-NJ Legal director Jeanne LoCicero. "Our clients are unable to take even the most basic precautions to protect

themselves against the virus. The government is failing in its obligation to keep people in its custody safe from harm, putting them and the wider community at risk."

Covid-19 Horror Stories Prompt ACLU NJ to File for Temporary Release of Medically Fragile Prisoners, Colleen O'Dea, WHYY.org (May 6, 2020), https://whyy.org/articles/covid-19-horror-stories-prompt-aclu-nj-to-file-for-temporary-release-of-medically-fragile-prisoners/. See also, e.g. Weill-Greenberg Elizabeth, Coronavirus is Ready to Explode Inside Fort Dix Federal Prison, Incarcerated People and Their Loved Ones say, The Appeal.org (April 23, 2020), https://theappeal.org/fort-dix-prison-new-jersey-coronavirus/.

The petitioners in the ACLU lawsuit have filed declarations from experts opining, among other things, that "persons currently detained at FCI Fort Dix are at significantly greater risk of contracting Covid-19 than if they were permitted to shelter in place in their home communities." Goldstein Declaration, Wragg v. Ortiz, 20-CV-05496 (D NJ) Dkt. No.1-1 at 8, para 37; and that "those who are medically vulnerable need to be moved out of FCI Fort Dix to the absolute maximum extent possible." Id. at 8 para.40.

The Warden of Fort Dix acknowledges in an April 11 notice to inmates that "social distancing is not possible in this environment." Id.

Despite the class action complaint being dismissed, the petitioners' accounts of the conditions raise concerns that are shared in many low-risk correctional facilities: living, sleeping, eating, and recreating in crowded conditions that make effective social distancing impossible. As such, prisoners at Fort Dix cannot comply with the Centers for Disease Control and Prevention guidelines for physically distancing, a "cornerstone" of risk reduction in prison. See CDC Interim Guidance on Management of Coronavirus Disease 2019 (Covid-19) in Correction and Detention Facilities (March 23, 2020) at 4 "Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory disease such as Covid-19." https://www.cdc.gov/2019-ncov/community/correction-detention/guidance-correction-detention.html.

In a recent Court ruling granting compassionate release to an inmate of Fort Dix Camp, the Judge had this to say:

"...the large population at Fort Dix, along with the lack of testing at the facility, may fail to accurately portray the crisis at the prison. Supposedly, the Government argues, because Fort Dix has not seen a spike in confirmed cases, it can be assumed that the preventative measures at the prison have been effective. Perhaps there are relatively few cases of the virus at Fort Dix. But the Court does not subscribe to the Government's line of thinking. It suggests that ignorance is the best policy: Fort Dix only needs to be concerned when test-confirmed cases increase but need not test widely. That strikes the Court as a risky deal-with-it-only-if-forced-to strategy." See United States v. Eric SiJohn Brown, No. 2:13-CR-00176-1 (ED PA Sept. 25, 2020)

Accordingly, the Court found that "there is more than a mere speculative risk of infection at Fort Dix." Id.

The risk was, indeed, not merely speculative, and the number of infected continues to rise. Fort Dix now has the highest number of infected prisoners in the Federal Prison System. The current number dwarf those that inspired Attorney General Barr to issue his memo of April 3, 2020 in which he exhorted the Director of the Bureau of Prisons to "Immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and at other similarly situated BoP facilities where Covid-19 is materially affecting operations."

It is worth noting that Fort Dix currently has ten times the number of infected inmates as the Attorney General characterized as "significant levels of infection" at Elkton, Oakdale, and Danbury and that to date the Warden of Fort Dix has not approved a single request for compassionate release.

Fort Dix is experiencing an out-of-control health risk. In response to that risk, judges around our district, and others whose defendants have been sent to Fort Dix, have intervened to protect the health of the incarcerated where the BoP is clearly unable to do so. The following list of some recent grants of compassionate release show how judges have used this authority.

> Fort Dix inmate granted compassionate release after serving 51 of 120-month sentence. Defendant pled guilty to one count of Conspiracy to Distribute a Controlled Substance, and one count of Conspiracy to Sell, Distribute, or Dispense a Controlled substance, a violation of 21 USC 846 and 841. He suffered from Obesity, Hypertension, and Hyperlipidemia. In granting his release to home confinement, the Court ruled, "[t]he Covid-19 numbers have reached problematic levels at the camp where Mr. Belliard is being housed, proving that BoP has been unable to protect the staff and inmates at Fort Dix." United States v. Belliard, No. 7:17-CR-00002-KMK-1 (SD NY January 7, 2021).

> Fort Dix inmate granted compassionate release after serving 90 of 120 month sentence. Defendant pled guilty to Conspiracy to Distribute Heroin and Using a Firearm in Furtherance of a Drug Crime. Defendant suffers from Asthma, Hypertension and Obesity. United States v. McCalla, No. CR-11-452(FLW), Lexis 116399, WL 3604120, (D NJ July 2, 2020).

> Fort Dix inmate granted reduction of Life in Prison to 30 years for "egregious participation in a brutal murder [and torture] of a government informant." 54 year old defendant suffers from Obesity and Type II Diabetes. United States v. Rodriguez, No. 00-CR-761-2(JSR, Lexis 181004, WL 5820161 (SD NY Sept. 30, 2020).

> Fort Dix inmate granted compassionate release after serving 120 of 151 month sentence as a career offender for Possession with Intent to Distribute Heroin. Defendant suffers from Hypertension. United States v. Robinson, No. 3:10-CR-261, Lexis 126535 (ED VA July 17, 2020).

Fort Dix inmate granted compassionate release after serving 26 of 60 month sentence for a guilty plea to a Hobbs Act Robbery, Obstruction of Justice, Using a Firearm During a Crime of Violence. Defendant suffers from Asthma, Obesity, and Sleep Apnea. United States v. Hayes, No. 17-20292, Lexis 124761 (ED MI July 15, 2020).

Fort Dix inmate granted compassionate release after serving 33 of 40 month sentence for Possession of Child Pornography, and Distribution of Child Pornography, in which the judge declared the "underlying offense was indisputably egregious." Defendant suffers from medical and mental issues. United States v. Amaro, No. 16-CR-848(KPF), Lexis 123626 (SD NY July 14, 2020).

Fort Dix inmate granted compassionate release after serving 116 of 147-month sentence for Hobbs Act Robbery and Use of a Firearm During a Crime of Violence, in which the defendant "threatened a three year old and Good Samaritans with a gun." Defendant suffers from COPD, Type II Diabetes, Obesity, and Hypertension. United States v. Hernandez, No. 10-CR-1288-LTS, Lexis 121562 (SD NY July 10, 2020).

Fort Dix inmate granted compassionate release after serving 32 of an 87 month sentence for being a Felon in Possession of a Firearm. Defendant "sold a firearm to a government informant" and had a lengthy criminal record, including "larceny (multiple, shoplifting, and drug distribution (at ages 18, 26, 28, 35, and 42)." 52 year old Defendant suffers from Obesity, Hypertension, Asthma, and Diabetes. United States v. Browne, No. 14-10369-LTS, Lexis 116518 (D MA July 2, 2020).

Fort Dix inmate granted compassionate release after serving 43 of 84 months for Conspiracy to Distribute Heroin, Crack Cocaine, and Marijuana, with a "lengthy criminal history." 47 year old defendant suffers from Obesity. United States v. Anderson, No. 16-CR-824-1(JMF), Lexis 96689, WL 2849483 (SD NY June 2, 2020).

Fort Dix inmate granted compassionate release after serving 63 of 144 months for Possession and Intent to Distribute Heroin, Possession of a Firearm in Furtherance of a Drug Crime, and Possession of a Firearm by a Convicted Felon, also with a "long criminal history." Defendant suffers from Sarcoidosis. United States v. Smith, No. 15-44, Lexis 113241 (WD PA June 26, 2020).

Fort Dix inmate granted compassionate release after serving 42 of 120 months for a "massive scheme" which resulted in the defendant pleading guilty to Conspiracy to Commit Health Care Fraud, and Conspiracy to Pay and Receive Health Care Kickbacks. 60 year old defendant suffers from Coronary Artery Disease, Diabetes, and Retinal Disease. United States v. Al-Jumail, No. 12-20272, Lexis 83120, WL 2395224 (ED MI May 12, 2020).
Fort Dix inmate granted compassionate release after serving 51 of 84 months for helping to "orchestrate a violent armed robbery that terrorized multiple victims, including children." Defendant pled guilty to Hobbs Act Robbery. 60 year old defendant suffers from

Hypertension. United States v. Pena, No. 15-CR-551(AJN), Lexis 85431, WL 2301199 (SD NY May 8, 2020).

Fort Dix inmate granted compassionate release after serving 30 of 54 months for Bank Fraud. Defendant suffers from Asthma, Diabetes, and Hypertension. United States v. Williams, No. 3:17-CR-121-(VAB)-1, lexis 72510 (D CT April 24, 2020).

Fort Dix inmate granted compassionate release after serving 93 of 148 months for Conspiracy to Possess with Intent to Distribute more than 28 grams of Cocaine Base and Conspiracy to Possess with Intent to Distribute more than 500 grams of Cocaine. Defendant suffers from Coronary Artery Disease, Diabetes, and Hypertension. United States v. Logan, No. 1:12-CR-307 & 1:12-CR-308, Lexis 103617 (ND NY April 22, 2020).

(C) Medical Considerations

The CDC has issued guidance concerning who may be "at increased risk for severe illness from Covid-19". That list includes "people of any age with: Cancer; Chronic Kidney Disease; COPD; an Immunocompromised state due to organ transplant; Obesity (body mass index [BMI] of 25 or higher); Serious Heart Conditions; Sickle Cell Disease; and Type 2 Diabetes Mellitus". Further, people with the following conditions "might be at an increased risk for severe illness from Covid-19: Asthma; Cerebrovascular Disease; Cystic Fibrosis; Hypertension or high blood pressure; Immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of immune weakening medicines; Neurologic conditions; Liver Disease; Pregnancy; Pulmonary Fibrosis; Smoking; Thalassemia; or Type 1 Diabetes Mellitus". See CDC list of People who need to Take Extra Precautions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-risk.html.

I suffer from chronic medical issues that have been identified by the CDC as placing me in a high risk category and the courts have confirmed the devastating impact of Covid-19 on vulnerable inmates with even one of those conditions.

I am 40 years old and suffer from Obesity (BMI of 32) and poorly controlled Hypertension and as an incarcerated individual it is impossible for me to follow the CDC's Covid-19 recommendations to protect myself from this highly transmissible disease. Either of my medical conditions would place me at higher risk for severe complications if I were to contract Covid-19, but together and combined with my inability to protect myself, the risks are exacerbated further.

As a person who suffers from obesity, which is one of the strongest predictive indicators of severe complications from Covid-19, I face a risk of death from Acute Respiratory Disease Syndrome (ARDS). One of the reasons given for obesity being a strong predictor of severe complications from Covid-19 is that obese individuals "may already have compromised respiratory function" and that "can cause compression of the diaphragm, lungs, and chest cavity" and further, "obesity is known to cause chronic, low-grade inflammation and an increase in circulating pre-inflammatory cytokines, which may play a role in the worst Covid-19 outcomes". See Roni Caryn Rabin, Obesity

Linked to Severe Coronavirus Disease, Especially for Younger Patients," New York Times (April 16, 2020).

"Obesity is more important for hospitalization than whether you have high blood pressure or diabetes, though those often go together, and it's more important than coronary disease or cancer or kidney disease, or even pulmonary disease". Id (quoting Dr. Leora Horwitz who is the senior author of the paper on the study of obesity and coronavirus and is the director of the Center for Healthcare Innovation and Delivery Science at NYU Langone).

A death by ARDS is particularly agonizing, because the patient suffocates to death as thick film covers the walls of the lungs, preventing oxygen from reaching the bloodstream and any of the vital organs. In patients who do not die, Covid-19 can severely damage lung tissue, requiring an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity.

The Court in United States v. Williams, in granting the release of a hypertensive defendant incarcerated at FCI Fort Dix, observed that the defendant "is unable to properly guard against infection while incarcerated," and specifically held: "On this record, it is clear: Mr. Williams's medical condition is serious, and he warrants protection from the risks of Covid-19, a risk that has been heightened by the outbreak of the pandemic at his current facility." United States v. Williams, No. 3:17-CR-121-(VAB)-1, 2020 WL 1974372, at *4 (D CONN April 24, 2020).

It has been acknowledged that "hypertension is one of the most common 'comorbidities' in people who experience severe cases of Covid-19." United States v. Salvagno No. 5:02-CR-51 2020 LEXIS 109879, (ND NY June 22,2020). In fact, "several peer-reviewed scientific studies and research commentaries in reputable scientific journals conclude that hypertension is independently associated with severe manifestations of Covid-19, controlling for the confounding variables of age and other health conditions. See Gao, et al., Association of Hypertension and Antihypertensive Treatment with Covid-19 Mortality, A Retrospective Observational Study, EUR HEART J. (June 5, 2020); Zhang, et al., Associations of Hypertension with the Severity and Fatality of SARS-CoV-2 Infection: A Meta-analysis, EPIDEMIOLOGY AND INFECTION (May 28, 2020).

It cannot be disputed that I am among those with the highest risk of death or serious illness from Covid-19.

This risk of serious illness, or even death, from an unprecedented global pandemic, together with the conditions at Fort Dix Minimum Security Camp, presents an extraordinary and compelling basis for sentence reduction.

## 3. APPLICABLE POLICY STATEMENTS FROM THE USSG (1B1.13)

Under 18 USC 3582(c)(1)(A), the court may modify my sentence if it finds that 'extraordinary and compelling reasons warrant such a reduction' and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." See 18 USC 3582 (c)(1)(A). The pertinent policy Statement is USSG 1B1.13.

Courts have disagreed over the whether the First Step Act allows courts to independently determine what reasons, for purposes of compassionate release, are "extraordinary and compelling," or whether that power remains exclusively with the BoP Director as stated in Application Note 1(D). It is manifest that its language is clearly outdated and cannot be fully applicable. The very first words of the Guideline are "[u]pon motion of the Director of the Bureau of Prisons." USSG 1B1.13 This is exactly what the First Step Act was expressly written to address. In addition, Application Note 4 says that "a reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 USC 3582(c)(1)(A)." USSG 1B1.13, n.4. Therefore, USSG 1B1.13 is outdated in light of the FSA, and no update to that Guideline appears forthcoming because the Commission currently lacks a quorum of voting members.

A majority of courts have concluded that the First Step Act freed district courts to exercise their discretion in determining what are extraordinary circumstances. See Untied States v. Young, No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (MD TENN Mar. 4, 2020); United States v. Scott, No. 17-CR-156, Lexis 85554, at *8 (ED WIS May 15, 2020); United States v. Mel, No. TDC-18-0571, Lexis 74491, at *3 (D MD Apr. 28, 2020); United States v. Haynes, No. 93-CR-1043-(RJD), Lexis 71021, at *14 (ED NY Apr. 22, 2020); United States v. Decatur, Lexis 60109, at *2-3 (D MD Apr. 6, 2020);United States v. Redd, No. 1:97-CR-00006-AJT, Lexis 45977, at *8 & 18 (ED VA Mar. 16, 2020; United States v. Lisi, Lexis 31127, at *3 (SD NY Feb. 24, 2020).

In a series of recent precedential rulings, courts have found "if a compassionate release motion is not brought by the BoP Director, Guideline 1B1.13 does not, by its own terms apply to it. Because 1B1.13 is not "applicable" to compassionate release motions brought by defendants, "Application Note 1(D) cannot constrain courts' discretion to consider whether reasons are extraordinary and compelling." See United States v. Zullo, No. 19-3218-CR, 2nd Cir. (Sep. 25, 2020); United States v. Brooker No. 19-3218-CR, 2020 US App. Lexis 30605 2nd Cir. (Sep. 25, 2020); United States v. Jones, No. 20-3701, 2020 US App. Lexis 36620 6th Cir. (Nov. 20, 2020); United States v. Gunn No. 20-1959, 2020 US App. Lexis 36612 7th Cir. (Nov. 20, 2020).

4. 18 USC 3553(a) FACTORS

In the final phase of the courts analysis, it must consider whether the factors set forth in 18 USC 3553(a) countenance such a reduction. The Court must consider what is "sufficient, but not greater than necessary, to comply with the purposes of [sentencing]." 18 USC 3553 (a).

The Court used the factors of 18 USC 3553 (a) to impose the original sentence and now must reevaluate if it has found extraordinary and compelling circumstances exist. In pertinent part, the Court must: (A) review the defendant's characteristics; (B) allow for due consideration of the seriousness of the offense, promote respect for the law, and provide just punishment; (C) protect the public from further crimes; and (D) provide the necessary correctional services and treatment.

I understand the reasons for the sentence that the Court imposed based on the 18 USC 3553 (a) factors and my conduct. I submit to the Court that the calculus may have changed due to the seriousness of Covid-19. I have done my best to rehabilitate myself and ask that as the Court

weighs the points herein, that my true remorse and my desire to lead a law-abiding life with my family is also considered.

(A) My Characteristics Allow A Sentence Reduction

While I understand the seriousness of the offense for which I was sentenced, I submit to the Court that I am a changed man from the one who stood before you at sentencing. Since my incarceration I have demonstrated that I am committed to successfully altering my conduct.  The Court is guided by the Supreme Court's observation that "evidence of post sentencing rehabilitation may plainly be relevant to the 'history and characteristics of the defendant." See Pepper v. United States, 562 US 476, 491 (2011).

In my 58 months of incarceration, I have received one minor disciplinary report. I have maintained a job for the entirety of my incarceration as an orderly with excellent evaluations for my performance. I participate in religious observations and due to the suspension of religious services during the pandemic, I have even led them. I believe that my spirituality has helped me become a changed man. I have completed Vocational Training in Horticulture, Hydroponics, and Turf Science, adding an additional skill to my resume. I am also currently enrolled in the ServSafe Certification program for Restaurant Managers, adding additional employment opportunities after my release.

I have completed many educational programs, even while they have become limited as a result of the pandemic, including: Independent Study American Revolution; Marine Life Series; Planet Earth Series; Parenting Program - Spanish Language; Positive Thinking; Threshold Faith Based Program; Machine Logic I; World Geography; Plumbing Systems - Buildings and Grounds; Introduction to OSHA; OSHA Personal Protective Equipment; OSHA Recordkeeping for Employees; OSHA Respiratory Protection; OSHA Silica Safety in Construction Environments; OSHA Blood Borne Pathogens; OSHA Formaldehyde Standards; Introduction to Robotics; Introduction to Carpentry; Healthy Minds and Bodies; Reading Blueprints; Heating Systems Basics; Asbestos Awareness; Floors and Floor Care Maintenance; Preventing Workplace Discrimination, and; many more. I have participated in every class available during the pandemic.

I successfully completed the Drug Education class and the Non-Residential Drug Awareness Program. I have been qualified for the Residential Drug Awareness Program. If it had not been for the pandemic, I would have been able to participate. Successful completion of that program includes a one year reduction of sentence and a minimum of one year of halfway house, moving my home eligibility date two years closer.

(B) Seriousness Of The Offense, Respect For The Law, And Just Punishment

While I know my crime was grave, I cannot state strongly enough the ways in which my current incarceration has changed the man I am. It would be impossible for the Court to understand the life altering feeling of being put in prison for an extended sentence. I immediately understood the damage I had done not only to myself, but to everyone who loved me.

Being in an environment like this puts everything else in stark perspective. The things that are truly important in life become unavoidably evident. The love and support of my family, the simplicity of the freedoms of everyday life, the availability of choice: those are the things I value most now.

I have served 51% of my statutory sentence and know that it has accomplished the goal of promoting respect for the law and acting as a deterrent. My potential exposure to Covid-19 could turn my current sentence into a death sentence. The court must weigh the value of deterrence against increasing the threat of a possibly lethal infection." See United States v. Gardner, No. 14-CR-20735-001, Lexis 129160, at *8 (ED MICH July 22, 2020). Bearing in mind "the harsh prison conditions imposed to avoid contracting Covid-19, the pandemic has rendered [my] sentence far harsher and more punitive than the Court [could have] anticipated at sentencing" See United States v. Diego Rodriguez, No. 00-CR-761-2-JSR, Opinion and Order (SD NY Sept. 30, 2020).

"A day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is unavoidably, experienced as more punishing." See United States v. Lizardi, 11-CR-01032, Doc 2523 at *7 (SD NY Oct. 9, 2020). The conditions I find myself in now are traditionally reserved for the incorrigible.

Indeed, recognizing this, courts around the country have found, in the context of Covid-19, that release will "allow the court to exert compassion ... and maintain the overall integrity of the legal system." See United States v. McKinnon, 2020 WL 4530737, at *4 (MD PA Aug. 6, 2020). Examples include:

> Defendant 3 months into a 12 month sentence: "On May 4, 2019, Ms. Foreman pled guilty to a one-count information charging her with tax evasion under 26 USC 7201. The Court sentenced her to a prison term of a year and a day.... On February 28, 2020, Ms. Foreman self-surrendered to the Bureau of Prisons... Ms. Foreman argues that at fifty-eight years old, she is highly vulnerable to complications from Covid-19 due to her hypertension and obesity. She argues further that the conditions at FCI Danbury, and her inability to social distance herself, leave Ms. Foreman with 'no way to protect herself in a prison environment...because staff move between the various facilities at Danbury, the lack of positive cases at the Camp, where she is housed, does not indicate that the facility has insulated itself from the virus'. The Court agrees.... Ms. Foreman is a first-time offender of a non-violent offense. She does not pose a threat to the community or a danger to the safety of any other person. In the absence of a decision from BoP to furlough Ms. Foreman, where time is of the essence, reduction of Ms. Foreman's sentence to time served...warrants the reduction" United States v. Foreman, No. 3:19-CR-62(VAB), Lexis 82330, at *1 (D CONN May 11, 2020).

> Defendant 2 months into a 12 month sentence: "Defendant was sentenced on December 19, 2019, to serve 12 months in custody and two years of supervised release on Count 1 of the indictment, Wire Fraud Conspiracy, a non-violent offense. Defendant fraudulently obtained nearly $107 million in government set-aside contracts from June 2005 to June

2013....Using its discretion, the Court considered Defendant's status as a first-time offender, age and health condition, among other factors, and granted Defendant a downward variance at sentencing....Defendant...has served approximately two months out of his 12 month custodial sentence....Pursuant to the Covid-19 pandemic, it appears to the Court that the Defendant's age and health condition place him in the highest risk category for complications and death from the disease if infected....The Court cannot ignore that the threat of Covid-19 exists now." United States v. Pomante, No. 19-20316, Lexis 85626, (ED PA May 15, 2020).

Defendant 4 months into a 42-month sentence: "Last year, the Court sentenced Sedrick Body to a forty-two-month prison term after he pled guilty to a charge of conspiracy to distribute heroin and crack cocaine... Body reported to prison on January 28, 2020, about four months ago... [S]ection 3582 (c)(1)(A) requires the Court to consider the factors...set forth in 18 USC 3553 (a)... This is where it gets difficult. The Court can say, unequivocally, that the amount of time served to date by Body does not adequately account for the seriousness of his offense. He is essentially a lifelong, unrepentant drug dealer[.] If the seriousness of the crime were the sole question, the Court would have no hesitation summarily denying Body's motion... But it is not the sole question... Body is now potentially exposed to severe infectious disease, the spread of which is likely increased in a prison environment. If he remains incarcerated, he may avoid contracting the Coronavirus, and if he contracts it, it is certainly possible that he will come through all right. But there is a very significant risk that the opposite will happen. It was not and is not the Court's intention, in imprisoning Body, to send him to his death or put him at daily risk of serious bodily harm. That, however, is the reality that Body is facing today. Requiring him to be subjected to the severe risk for an extended period does not amount to just punishment, nor does it in the Court's view, promote respect for the law. As a condition of reducing Body's prison term, however, the Court will add a supervised release condition of twelve months of home detention with location monitoring. In other words, Body's liberty will continue to be restricted in a significant way for the next twelve months." United States v. Body, No. 18-CR-503-1, Lexis 92069, (ND ILL May 27, 2020).

Defendant 2 months into a 24 month sentence: "Defendant Anil Prasad reported to the Federal Correctional Institute in Oakdale, Louisiana ("Oakdale") on March 30, 2020 to serve a 24 -month sentence for conspiracy to unlawfully prescribe controlled substances for no legitimate medical purpose....and conspiracy to commit health care fraud....This Court finds that, in light of the heightened medical risk the Covid-19 virus poses to Prasad in particular, there are extraordinary and compelling reasons to order his immediate release from Oakdale....In addition, the conditions of incarceration, in which inmates sleep, eat, and shower in close quarters, make controlling the spread of Covid-19 extremely difficult. Prasad is therefore unable to provide self-care within the environment of the correctional facility to avoid contracting Covid-19....While serious, his offenses were non-violent.... In addition, the 3553 (a) sentencing factors support his release. this Court finds that, considering Prasad's medical condition and need for medical care, a modified sentence requiring Prasad to serve the remainder of his sentence on home confinement sufficiently

reflects the seriousness of his offenses and promotes respect for the law." United States v. Prasad, No. 19-71 Section; H, Lexis 96249, at *1 (ED LA June 2, 2020).

Defendant 4 months into a 24 month sentence: "On January 13, 2020, Defendant was sentenced to a term of imprisonment of twenty four months, followed by three years of supervised release, ECF No. [44], and he voluntarily surrendered himself to federal custody on February 26, 2020....In particular, neither the history or characteristics of the defendant, nor the considerations regarding the need for the sentence imposed, warrant keeping the Defendant in federal custody while he suffers from diabetes, hypertension, asthmatic symptoms, and Covid-19. While there is no doubt that the Defendant's conviction was serious, the Court recognizes that he had no prior criminal convictions, which suggests that Defendant does not pose a high risk of committing further crimes. Moreover, releasing Defendant to strict home confinement allows him to continue to repay his debt to society, imposes an adequate punishment, and promotes respect for the rule of law, while simultaneously allowing him to seek medical care and treatment by providers who are familiar with his medical issues and equipped to treat him....Additionally, the fact that Defendant has served less than five months of his sentence is not dispositive given Defendant's current health issues and the obstacles he faces in receiving adequate and complete treatment while incarcerated. Requiring Defendant to continue serving his sentence in federal custody while seriously ill and with the risk of inadequate medical care means that his sentence [would be] significantly more laborious than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in 18 USC 3553 (a)(2)." United States v. Vasquez Torres, No. 19-CR-20342-BLOOM, Lexis 121435, at *1 (SD FLA July 14, 2020).

Defendant 7 months into a 51 month sentence: "Defendant is a 51 year old inmate currently detained at the Jessup Federal Correctional Institution ("FCI")....On December 19, 2019, Defendant was sentenced to fifty one months imprisonment and three years of supervised release....Defendant has established that his underlying health conditions place him at higher risk of developing complications from Covid-19....[A]s the government emphasizes, he has served just over ten percent of his fifty one month sentence. Defendant deserved the sentence the Court imposed in December 2019. But the extraordinary nature of the Covid-19 pandemic has altered life as we know it. The risks to the Defendant's life and health now outweigh the punitive benefits that would be gained from keeping him incarcerated at this time. Accordingly, the Court intends to convert Defendant's remaining term of imprisonment into a one year term of home confinement as an additional condition of supervised release. Under these circumstances, the Court is satisfied that the objectives of 18 USC 3553 (a) are satisfied." United States v. Smith, No. CR19-107RSL, Lexis 134596, at *1 (WD WASH July 29, 2020).

Defendant 7 months into a 72 month sentence: "On January 9, 2020, Defendant was sentenced to seventy two months incarceration. Defendant...is scheduled to be released April 2024....Defendant, a forty one year old man,...[his] compromised health conditions, taken in concert with the Covid-19 public health crisis, constitute an extraordinary and

compelling reason to modify Defendant's sentence....Defendant was convicted for a non-violent crime and, although he has not served the majority of his sentence and certain sentencing factors may weigh against release, the sentencing factors do not override the high risk of severe illness or death posed by Covid-19. It is hereby ORDERED that. for the foregoing reasons, Defendant's application is GRANTED." United States v. Ramirez, No. 19CR 105(LGS), Lexis 145800, at *1-4 (SD NY Aug 6, 2020).

Defendant 9 months into a 54 month sentence: "The coronavirus outbreak, the virus's confirmed presence in FCI Terre Haute and the evidence that it is not under control in the institution, and the risks the virus poses to Sullivan due to his medical condition certainly qualify [as extraordinary and compelling reasons]....The amount of time served to date by Sullivan does not adequately account for the seriousness of his offense; the Court concluded as much when it sentenced Sullivan to a fifty four month prison term.... [A]lthough the Court was satisfied at the time of sentencing that it was imposing a fair and reasonable sentence, matters have changes significantly. Sullivan is now exposed to an infectious virus, the spread of which is almost certainly increased in a prison environment. And he faces a significant risk of a severe outcome if he contracts the virus... Requiring him to be subjected to this severe risk for an extended period does not, in the Court's view, amount to just punishment, nor does it promote respect for the law." United States v. Sullivan, 2020 WL 5630508, at *1 (ND ILL Sept. 21, 2020).

Defendant 24 months into an 87 month sentence: "Jackson participated in a brazen robbery of a Brinks armored truck...while using and carrying a firearm...more than $600,000 was stolen [and] less than $10,000 was recovered...Jackson, [31 years old,] suffers from Hypertension,...which is currently under control,...is morbidly Obese (defined as a BMI of > 40)...this condition also favors granting Jackson's release because of the likely effect contracting Covid-19 would have on him...most concerning is [his] history of bronchitis...respiratory illnesses such as asthma and chronic bronchitis are also recognized as increasing the risk associated with contracting Covid-19...In sum, Jackson's medical risk factors combined with the continued widespread presence of Covid-19 in FCI Elkton, creates a circumstance that is extraordinary and compelling...his medical profile suggests there could be dire consequences. I sentenced Jackson to 87 months in prison, I did not sentence him to contract and potentially die from a deadly virus in prison. United States v. Jackson, No. 2:18-CR-86-PPS, Lexis 108255, (ND IN June 19,2020).

(C) Danger To The Community

As I have previously stated, I am currently incarcerated at FCI Fort Dix Minimum Security Camp. I have been assigned an "out custody" level, and if Fort Dix were not adjacent to a working military installation, I would be in "community custody". I have been graded a Minimum Security Classification by the Bureau of Prisons. Further, according to the BoP's PATTERN Risk Assessment system, I score a Minimum, or the least likely to recidivate. Each of these suggest that the BoP itself, and by extension, the Department of Justice considers me no threat to the community or to re-offend.

16

My crime, although serious, was non-violent. If the Court deems it necessary, it could impose as a condition of my Supervised Release, a period to be spent on GPS-enforceable Home Confinement, effectively expanding my incarceration to a place which would not pose the same risks to me or any risk to the community.

While Home Confinement may be more comfortable, it is still confinement. I do not wish to avoid my just punishment, I wish only to avoid unintended consequences of my presence in a congregate environment in which the pandemic can, and surely will take lives.

   (D) FCI FORT DIX CAN Offer Me Nothing But A Cell

I maintain that a sentence reduction is warranted because most educational, and all programming, religious, and vocational opportunities that may have been available to me have been suspended with no return in the foreseeable future. Further, by eliminating these correctional activities, the BoP presently has nothing to offer me but a cell. I respectfully submit that at some point incarceration serves no meaningful purpose but to effect punishment for punishment's sake. Indeed, both federal statutes and the Guidelines acknowledge that "rehabilitation is not to be achieved through imprisonment. See United States v. Anderson 15 F. 3rd 278,282 (2nd Cir. 1994) (citing 18 USC 3582(a) and 28 USC 994(k)).

The overriding factor under 18 USC 3553(a) that was not present at the time of sentencing is the Covid-19 pandemic and the serious risk it presents. Although the seriousness of my offense led the Court to impose its original sentence, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness.

### MY RE-ENTRY PLAN WOULD PROTECT MY FAMILY, THE COMMUNITY AND ME

If the Court grants my Motion, I will reside in Paramus, New Jersey with my mother, brother, and daughter. They have set aside a separate room for me to self-isolate for a 14 day quarantine period. They are available at the Court's convenience to confirm that they are not only willing to accept me into their home, they are anxiously awaiting my safe arrival.

I have employment available on my release at Bay Realty Inc. of Patterson New Jersey assisting in obtaining city construction permits and being on site for the city inspector. Health insurance will be provided by my employer to help with any emergent medical needs I may have. I am willing and able to begin work as soon as the Court deems it appropriate. Until such time as I am permitted to work, I plan to continue my education and try to be a better father, son, brother, and member of my community and church.

### CONCLUSION

WHEREFORE, for all the above reasons I respectfully request that the Court reduce my sentence to time served and order my immediate release from BoP custody. I do not object to the Court imposing a condition of home confinement should it see fit.

JEAN VALDEZ

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES

v.                                                                                    1:16-CR-00266-PGG

JEAN VALDEZ

Supplemental Motion to Treat Motion for Compassionate Release as an Emergency Motion

I, Jean Valdez, pro se, respectfully submit this supplement to treat my Motion for Compassionate Release Pursuant to 18 USC 3582 (c)(1)(A) as an emergency motion. There has been a major outbreak at Covid-19 at FCI Fort Dix, including the Fort Dix Minimum Security Camp (the "Camp") at which I am housed. Regrettably, this outbreak has resulted in the death of inmate Myron Crosby, who lived in my housing unit.

This is the third wave of the Coronavirus to hit Fort Dix, during which hundreds of men became sick at the Low Security Prison. Sixty five of the 136 men at the Camp are currently quarantined as positive. Over the course of the last three months more than 1400 men have been infected with the disease making Fort Dix Federal Prison one of the more virulent hot spots in the country, prison or not. My dormitory at the Camp was tested for Covid-19 on December 28, 2020, and 31 of 65 men were positive. While the test results were returned to prison staff on December 31, unconscionably, the sick inmates weren't removed to quarantine until after the holiday weekend on January 4, 2021. One of those men was Myron Crosby who was sent to Robert Wood Johnson after four days of asking for care, where he subsequently died on January 22, 2021.

A delegation of all members of the United States Congress from the State of New Jersey penned letters on November 9 and December 8, 2020 to Michael Carvajal, Director of the BoP, decrying the reckless disregard for human life. In a response letter dated December 16, Director Carvajal claimed "the efficacy of the Bureau's mitigation strategies can be seen in the very low numbers of hospitalized inmates." The infection rate at the BoP, however, continues to be 5.5 times higher than the general population and the death rate is three times higher. See Federal Defenders of New York, BoP reported positive Tests for Covid-19 Nationwide, https://federaldefendersny.org.

In a recent ruling granting compassionate release to a Camp inmate who had served 51 of 120 months for violations of 21 USC 841 and 846, the court noted that the "Covid numbers have reached problematic levels at the camp where Mr. Belliard is being housed, proving that the BoP has been unable to protect the staff and inmates at Fort Dix." See United States v. Belliard, No. 7:17-CR-00002-KMK-1 (SD NY Jan. 6, 2021).

1

The nine members of the United States Congress from the State of New Jersey now wrote to Department of Justice Inspector General Michael Horowitz urging him to expand his ongoing investigation of the BoP's handling of the Covid-19 pandemic. "[W]e urge you to immediately investigate the Covid-19 response at FCI Fort Dix, including infection control and testing procedures, access to medical care, impacts on living conditions, and transfers to home confinement. We are gravely concerned that without additional oversight, BoP will continue to endanger the lives of incarcerated individuals and staff at FCI Fort Dix."

It is in this emergent condition that I ask you to treat my Motion for Compassionate Release as an emergency and in some way expedite the process so that I am not subjected to the severe complications that may result from continued exposure to the conditions here. My service of over 48% of my sentence sufficiently reflects the seriousness of the offense and satisfies the need to provide just punishment and affect adequate deterrence.

Respectfully Submitted,

Jean Valdez

**Certificate of Service**

I hereby certify that a copy of the enclosed Motion has been duly served upon the following, first class postage pre-paid, via the United States Postal Service:

**Sugar Kananur Ravi**

**US Attorney's Office, SD NY**

**One St. Andrew's Plaza**

**New York, New York  10007**


JEAN VALDEZ

**MEMO ENDORSED:**

Defendant Jean Valdez's second application for compassionate release is denied.

On June 19, 2017, Defendant Valdez pled guilty to conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. (Plea Tr. (Dkt. No. 98)) On October 20, 2017, this Court sentenced Valdez to 135 months' imprisonment. (Sent. Tr. (Dkt. No. 116) at 31) Valdez is currently incarcerated at the prison camp associated with FCI-Fort Dix. His projected release date is November 12, 2025. (See June 8, 2020 Govt. Opp. (Dkt. No. 126) at 1-2)

On May 10, 2020, Valdez moved for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), arguing that the COVID-19 virus presented a serious risk to his health. (See (Dkt. No. 124) (Valdez's motion was docketed on June 1, 2020)) On June 9, 2020, this Court denied Valdez's application by memo endorsement, finding that Valdez (1) had not exhausted his administrative remedies; (2) faced a low risk of contracting the COVID-19 virus and was in good health; and (3) had not met his burden to demonstrate that he would not present a danger to the community if he were released. (See June 9, 2020 Order (Dkt. No. 127))

On March 16, 2021, Valdez filed a second motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). (See Def. Mot. (Dkt. No. 129))

As to exhaustion of administrative remedies, Valdez claims that – in an "April 2020" letter – he asked the warden of FCI-Fort Dix to move for his release pursuant to the compassionate release statute. (Id. at 3) The Bureau of Prisons has no record of this letter, however, and the Government again argues that Valdez has not exhausted his administrative remedies. (Mar. 30, 2021 Govt. Opp. (Dkt. No. 131) at 1-2)

Even if Valdez had exhausted his administrative remedies, his application for compassionate release fails on the merits. Valdez – who is 40 years old – claims that he suffers from obesity, with a BMI of 32, and hypertension. (Def. Mot. (Dkt. No. 129) at 1, 9) He also contends that cases of COVID-19 are rising at FCI-Fort Dix, and that "[s]ixty five of the 136 men housed at the Camp are currently positive." (Id. at 1-2; see also id. at 4-5)

In its March 30, 2021 submission, the Government asserts that "while Fort Dix has had a large number of inmates and staff test positive for the COVID-19 virus and currently has confirmed active cases for 15 inmates and 42 staff, Valdez has regularly tested negative for COVID-19 and has been housed in the completely separate Camp at Fort Dix which, as of the date of this filing, does not have any confirmed active cases of COVID-19." (Mar. 30, 2021 Govt. Opp. (Dkt. No. 131) at 3)

As of May 24, 2021, there are no COVID-19 positive inmates or staff at FCI-Fort Dix or the associated prison camp. Since the outset of the pandemic, 1,781 inmates have contracted and recovered from the COVID-19 virus; 93 staff members have contracted and recovered from the virus; and two inmates and no staff members have died as a result of the virus. See COVID-19 Coronavirus, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited May 24,

2021).  As of May 24, 2021, 247 staff members and 1,481 inmates have been inoculated with a COVID-19 vaccine.  Id.

On March 22, 2021, Valdez was offered the Pfizer COVID-19 vaccine, but he refused the shot. (Mar. 30, 2021 Govt. Opp. (Dkt. No. 131) at 3; see also Mar. 30, 2021 Govt. Opp., Ex. A, at 25, 34 (medical records showing that Valdez refused the COVID-19 Pfizer vaccine))

Given these circumstances, Valdez has not shown that "extraordinary and compelling reasons" justify his release.  See, e.g., United States v. King, No. 16-CR-478-11 (CS), 2021 WL 736422, at *2 (S.D.N.Y. Feb. 24, 2021) (noting that defendant refused the Pfizer COVID-19 vaccine and thereby "declined the opportunity to reduce his risk exposure to COVID-19 dramatically; he cannot reasonably expect that prolonging his risk by declining vaccination will be rewarded with a sentence reduction" (citation and quotation marks omitted)); id. (finding that extraordinary and compelling circumstances did not exist and denying defendant's motion for compassionate release); United States v. Bryant, No. 06-CR-17-LTS, 2021 WL 738838, at *2 (S.D.N.Y. Feb. 24, 2021) ("[The defendant's] refusal to accept a risk-mitigating measure [i.e., the vaccine], even one with a period of delay in its efficacy, is relevant to whether the risk of infection he faces in the MDC is extraordinary and militates against finding that the degree of risk compels release."); see also United States v. Mascuzzio, No. 16 Cr. 576 (JFK), 2021 WL 794504, at *3 (S.D.N.Y. Mar. 2, 2021) ("[E]ven if [the defendant's] health issues constituted 'extraordinary and compelling reasons' to reduce his sentence – which the Court would be hard-pressed to conclude in light of [the defendant's] voluntary refusal of an approved vaccine[,] . . . application of the § 3553(a) sentencing factors once again outweighs the reasons [the defendant] proffers for a reduction to his sentence." (citations omitted)))

Finally, Valdez's second compassionate release motion – like his first application – does not demonstrate that he would not present a danger to the community if he were released.  As discussed in this Court's June 9, 2020 Order denying Valdez's first compassionate release motion (see Dkt. No. 127) at 15), Valdez participated in a conspiracy to distribute 50 to 150 kilograms of cocaine.  He used vehicles with trap compartments to transport cocaine between New Jersey and New York nearly every day for several months.  Law enforcement officers recovered $120,000 in cash in his residence.  (Sent. Tr. (Dkt. No. 116) at 10, 12, 26-27; PSR ¶¶ 14-18, 29, 34)  In sum, there is compelling evidence that Valdez's release at this time would present a danger to the community.

Accordingly, Valdez's second motion for compassionate release (Dkt. No. 129) is denied.  A copy of this memo endorsement will be mailed to Defendant by Chambers.


SO ORDERED.

Paul G. Gardephe
United States District Judge
Dated: May 24, 2021